Filed 6/30/26

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br>v.<br>DAVID WAYNE DePAPE,<br><br>    Defendant and Appellant. | A170759<br><br>(San Francisco County<br> Super. Ct. No. 22012966) |

David Wayne DePape was charged in both federal and state court of offenses arising from an October 2022 attack on Paul Pelosi, the husband of then Speaker of the United States House of Representatives Nancy Pelosi. After he was convicted and sentenced in federal court, DePape sought dismissal of four of the eight counts in the state case pursuant to California's statutory double jeopardy protections. The trial court granted the motion as to three counts. The People appeal. We affirm.

# BACKGROUND

## I.

### *Factual Background*[1]

Shortly after 2:00 a.m. on October 28, 2022, Paul Pelosi (Pelosi[2]) was awakened by the sound of the door to his bedroom bursting open and saw a "very large man," later determined to be DePape, standing with a hammer and some zip ties in his hand. DePape asked if he was Paul Pelosi; Pelosi said he was and DePape asked, "Where's Nancy?" When Pelosi said she was in Washington, DePape said they would have to wait for her and he was going to tie Pelosi up. DePape said, " 'She's second in line to be President, right?' " and " 'Well, we're going to have to take them out.' " Pelosi got up and walked to the elevator that was just outside the bedroom, thinking he could use the phone in it to call 911, but DePape followed and held the door of the elevator open, so Pelosi returned to the bedroom. DePape was saying things like, " 'They're all corrupt. You've got to take them out.' " Pelosi, trying to engage in conversation to de-escalate the situation, asked if he could " 'help in any way.' "

Pelosi walked to the bathroom, where his phone was charging, put the phone on speaker and called 911. He tried to communicate his need for help without speaking too plainly, because DePape was standing right outside the bathroom, still holding the hammer, and Pelosi was afraid of what DePape might do. The call ended when DePape told Pelosi to hang up and give him

---

[1] As will be explained, the trial court ruled on DePape's motion to dismiss at the conclusion of the People's case in chief. Accordingly, our recitation of the facts is based solely on the evidence presented by the People.

[2] For ease of reading, we will refer to Paul Pelosi by his surname only and use Nancy Pelosi's full name when referring to her.

the phone, which Pelosi did.  Pelosi did not know whether the police were being sent.

DePape said he needed to sleep and was going to tie Pelosi up.  Pelosi thought he would be safer on the ground floor, where he might be able to open the front door if the police came, and since DePape had said he had a backpack and "a bunch of stuff" downstairs, Pelosi suggested they go down for DePape to get his belongings and sleep there.  DePape followed Pelosi down two flights of stairs and, as they stood in the front foyer, DePape said, " 'I have to take you out' " and " 'the police are going to be here, and it's all over for me.' "  Pelosi told him the police did not get the message and were not going to come, then the doorbell rang.

Pelosi was able to open the door saw two police officers standing outside.  DePape got "immediately behind" Pelosi, "off [his] right shoulder," still holding the hammer.  Pelosi was afraid DePape was going to hit him.  Because the police officers did not seem to be doing anything, Pelosi reached out to put his hand on the hammer.  The police said, "Drop the hammer," DePape did not respond and Pelosi put his hand on the hammer, saw DePape "obviously going to hit [him]," then "just went out."

The two police officers testified that when the front door opened, they saw DePape and Pelosi holding the hammer between them, DePape holding the handle and Pelosi holding the metal head.  Officer Willmes told them to drop the hammer and DePape said no, then pulled the hammer away, raised it above his head, swung it at Pelosi and hit Pelosi in the head with it.  Willmes described DePape as using both hands to "rip" the hammer away from Pelosi; Officer Cagney testified that DePape was "using his body more so than his arms" and that he believed DePape struck Pelosi with the hammer two times.

3

The officers immediately rushed in and tackled DePape.  Pelosi was lying face down, unconscious and bleeding from the head.  Cagney testified that less than five seconds passed from when the officers first saw the hammer and when they tackled DePape.  The incident was recorded on the officers' body cameras and played in court as each officer was asked about the footage from his camera.

Asked how he got into the house, DePape pointed to a hole in the glass door to the porch.  He said his backpack was on the porch and the police found a large backpack there, along with a sleeping bag and a smaller backpack.[3]  DePape told one of the officers at the scene that he had come to Pelosi's house "to have a little chat with his wife" because he was sick of the "lies coming out of Washington D.C." and told Pelosi to stop "escalating things" or DePape would have to "go through him."  DePape said hurting Pelosi was not his "goal" but he was on a "suicide mission" and because Pelosi "forced the issue," DePape "attacked" Pelosi "[r]ight in front of the cops."  DePape said, "There's no denying what I did."

DePape's statements in an interview at the hospital[4] several hours later, a recording of which was played at trial, were to the same effect.  DePape talked about "all the fucking lies" coming out of Washington, with Nancy Pelosi "the fucking leader of the pack," and said the "record breaking crime spree" the Democratic party was on "originate[d] with Hillary" but Nancy Pelosi "ran with the lying as much or more than anyone."  He said he

---

[3]  The contents of the backpacks included a sledgehammer, various electronic devices and accessories, two body cameras, duct tape, latex gloves, a passport and other documents in DePape's name, over $9,000 cash, two unicorn costumes, vitamins and food items.

[4]  DePape was treated for a dislocated shoulder and a cut that required stitches.

4

planned to hold Nancy Pelosi hostage, film her while talking to her, let her go if she told the truth and "break her knee caps" if she lied, which he knew "beyond a doubt" she would do. He wanted Nancy Pelosi and the other "corrupt" politicians to realize there is "a fucking consequence for being the most evil fucking people on the planet."

DePape said that Pelosi was not a target but Pelosi was "pushing [DePape] into a corner" and DePape could not let Pelosi stop him from going after his other targets.[5] DePape did not leave the house despite knowing the police were coming because he intended to "fight tyranny" and not "surrender." In DePape's view, his interaction with Pelosi had been "pretty amicable overall" but he got angry and hit Pelosi with the hammer when he realized Pelosi thought he was going to surrender to the police—"it's like, if you stop me from coming after evil, you will take the punishment instead." DePape did not know how many times he hit Pelosi but he "definitely" hit him and "[i]t was not a tap. It was full force." In a portion of DePape's testimony at the federal trial that was read into evidence, DePape acknowledged that he hit Pelosi with the hammer with "full force," and that he knew exactly what he was doing.

Pelosi suffered two lacerations on the right side of his scalp with corresponding skull fractures. The more serious of these was a jagged injury through the scalp down to the bone, where the skull was broken and the broken piece was pushed downward, its edge wedged underneath the rest of

---

[5] These included Gayle Rubin, a professor DePape believed wanted to turn schools into "pedophile molestation factories" and encourage kids to become transgender, hate society and want to overthrow it; Gavin Newsom, for signing a bill restricting guns; Tom Hanks, who DePape believed had been identified as a pedophile; and Hunter Biden, to get him to "confess" and implicate President Biden.

the skull. The surgery to repair this injury required drilling around the fracture fragment to remove a piece of the skull and lift the fragment back into place, then secure it with small plates and screws. The second cut was in the scalp above the ear; a muscle that helps with chewing was torn and the skull was fractured but not pushed down as much as the first fracture. In addition to the lacerations and fractures, Pelosi suffered a concussion, a brain injury that can have long-term effects including headaches, dizziness, difficulty with concentration or memory and depression or "psychological disturbances." Pelosi testified that initially he got headaches "all the time" and needed frequent naps; 18 months later, these problems were lessening but he was not fully recovered. He was still going to therapy for balance and walking and continued to experience dizziness and head pain.

## II.

### *Procedural Background*

DePape was charged by information filed on December 23, 2022, with six felony offenses: Willful, deliberate and premeditated attempted murder (Pen. Code,[6] §§ 664/187) (count 1); first degree residential burglary (§ 459) (count 2); inflicting injury on an elder likely to cause great bodily injury (§ 368, subd. (b)(1)) (count 3); assault with a deadly weapon (§ 245, subd. (a)(1)) (count 4); false imprisonment of an elder (§ 368, subd. (f) (count 5); and threatening a family member of a public official (§ 76, subd. (a)) (count 6). It was alleged that DePape personally used a deadly weapon (§ 12022, subd. (b)(1)) in the commission of all counts except count 4; that he personally inflicted great bodily injury on a person 70 years of age or older (§ 12022.7, subd. (c)) in the commission of counts 1, 4 and 6; and, in

---

[6] Further statutory references will be to the Penal Code unless otherwise specified.

6

connection with count 3, that the victim suffered great bodily injury (§ 368, subd. (b)). The offense in count 2 was alleged to be a violent felony (§ 667.5, subd. (c)(21)). The information alleged five aggravating circumstances relating to the crimes (Cal. Rules of Court,[7] rule 4.421(a)(1), (2), (3), (7) & (8)) and one aggravating circumstance relating to the defendant (rule 4.421(b)(1)). DePape pleaded not guilty to all counts, denied all allegations and waived his right to a speedy trial.

On November 16, 2023, DePape was found guilty in federal court of offenses arising from the incident underlying the offenses in the present case: attempted kidnapping of a federal officer (Nancy Pelosi) (18 U.S.C. § 1201(a)(5), (d)) and assault on an immediate family member of a federal official (Pelosi) (*id.* § 115(a)(1)(A)), with use of a dangerous weapon.

In January 2024, DePape asserted his right to a speedy trial in the present case. On April 19, 2024, the parties stipulated that trial commenced that day.[8] The court and counsel met to discuss scheduling and other trial matters on April 22 and 29, and the case was continued to May 7 for trial. Following pretrial motions, jury selection began on May 10 and continued over several days. The jury was sworn in on May 24.

Meanwhile, on May 17, 2024, DePape was sentenced in the federal case. DePape immediately moved to dismiss counts 1-4 in the present case on grounds of double jeopardy (§§ 656, 793), sending the motion electronically on May 17 and formally filing it on May 21. DePape requested judicial notice of court records in the federal case: The indictment, the final jury

---

[7] Further references to rules will be to the California Rules of Court unless otherwise indicated.

[8] The time limit for beginning the trial had been extended after a defense request for a continuance was granted.

instructions, the jury verdict, DePape's motion for a new trial, the order denying that motion, and the court's minutes for the May 17, 2024 sentencing hearing. DePape stated that in addition to his plea of not guilty, he was entering a plea pursuant to sections 1016(4) and 1017(3) that he had " 'already been convicted of the offense charged.' "

On May 21, 2024, the People moved to amend the information to add two counts: aggravated kidnapping resulting in bodily harm (§ 209, subd. (a)) (count 7), with an allegation of deadly weapon use (§ 12022, subd. (b)(1)); and preventing or dissuading a witness by force or threat (§ 136.1, subd. (c)(1)) (count 8). Both counts alleged personal use of a deadly weapon. (§ 12022, subd. (b)(1).) The court granted the People's request to amend the information and DePape entered pleas of not guilty to counts 7 and 8. The court denied a defense request for a continuance.

The People opposed the motion to dismiss as untimely as well as on the merits. At a hearing on May 28, the court discussed concerns with the timing of the motion and the evidentiary basis for the parties' arguments and concluded it would not rule until after the prosecution presented its case in chief.

Presentation of the case to the jury began on May 29, 2024, and the People rested on June 4. On June 5, the court granted DePape's unopposed request for judicial notice.[9] DePape argued for dismissal of counts 1 through

---

[9] Prior to addressing the double jeopardy motion, the court granted the People's motion to amend the information by adding great bodily injury enhancement allegations to counts 2, 3 and 5 and removing that allegation from count 6. The second amended information was filed and DePape entered pleas of not guilty and once in jeopardy to each of the charges and denied all the allegations.

4 and 7 on the basis that they charged offenses arising from the identical acts for which he had been tried and convicted in federal court.

On June 6, 2024, the court granted the motion to dismiss counts 1, 3 and 4 (attempted murder, injuring elder and assault charges) and denied it as to all other counts. At the request of both parties, the court stayed the trial for one week to enable them to seek writ relief. The parties each filed writ petitions and stay requests, which this court denied on June 13, 2024. The People's notice of appeal from the June 6 order was filed on June 7, 2024.

## DISCUSSION

## I.

### *People's Right To Appeal*

Section 1238, subdivision (a)(8) provides that the People may appeal from "[a]n order or judgment dismissing or otherwise terminating all or any portion of the action including such an order or judgment after a verdict or finding of guilty or an order or judgment entered before the defendant has been placed in jeopardy or where the defendant has waived jeopardy."[10] After the People filed their opening brief, DePape moved to dismiss the appeal as unauthorized. The People opposed the motion and we denied it

---

The court also heard and denied motions DePape had filed the day before to dismiss count 7 pursuant to section 995 and to dismiss counts 7 and 8 for vindictive prosecution.

[10] The "jeopardy" at issue here is jeopardy in the present case (i.e., the start of trial), not the jeopardy from the federal trial pertinent to the merits of DePape's double jeopardy claim. (See *People v. McDougal* (2003) 109 Cal.App.4th 571, 580-581 [merits of double jeopardy claim arising from first trial distinct from issue of jeopardy at second trial relevant to People's right to appeal].) "[I]t is settled that a defendant who seeks dismissal *before* the jury has rendered a verdict consents to the dismissal and by that consent waives any argument that jeopardy has attached so as to bar an appeal." (*McDougal*, at p. 581, italics added.)

with the following order: "Respondent DePape's opposed motion to dismiss the appeal is denied. Under the circumstances, we conclude DePape waived jeopardy by filing a motion to dismiss on the eve of trial. Consequently, the People may appeal the trial court's order granting the motion pursuant to Penal Code section 1238, subdivision (a)(8)."

DePape revisits the issue in his respondent's brief, challenging our conclusion that he waived jeopardy. As noted, DePape filed his motion to dismiss subsequent to the stipulated first day of trial, during jury selection. Relying on *Jackson v. Ryder Truck Rental, Inc.* (1993) 16 Cal.App.4th 1830, 1848, he argues that although the timing of his double jeopardy motion caused it to be heard after jeopardy attached, the trial court's independent reason for ruling on the motion when it did operated as a superseding cause that broke the "chain of causation." DePape urges that the trial court acknowledged he had a valid legal reason for waiting until the federal court issued its judgment before filing the double jeopardy motion; the motion could have been decided prior to jeopardy attaching if the court had granted his request for a continuance; and the court instead chose to defer ruling on the motion until after the prosecution's case in chief because the court wanted a better understanding of the People's "version of the story."

DePape's characterization of the circumstances is inaccurate. The trial court acknowledged that DePape's decision to wait for the federal judgment was "a defensible legal position, maybe not the only legal approach to this topic, but defensible on the face of it."[11] But the court emphasized DePape's

---

[11] DePape maintained that his motion was timely because, under section 1017, subdivision (3), a "plea of former conviction requires a 'judgment' " and he was filing the motion at the first opportunity after the district court rendered judgment. Section 1017, subdivision (3) provides that a plea of former conviction must be "substantially" in the form, " 'The

10

failure to make any mention of the motion despite how much time passed since the federal jury verdicts,[12] commented that the motion was too lengthy, "well researched" and "well argued" to have been written a day or two before it was filed, and expressed the view that "the defense maintained an element of surprise by not mentioning a motion to dismiss . . . but finally offering it in the first instance on May 17th."

The court then explained its decision to defer ruling on the motion until after the prosecution's case in chief in terms of both assisting the court and addressing the People's objection that the late filing of the motion violated the governing local rules. As to the former, the court explained that deferring decision would put the court in a better position to decide the merits of the motion, as the double jeopardy analysis required it to "focus on acts," "[a]cts are established by evidence," and "although I have a preliminary hearing transcript and I have representations by both sides in your papers, I don't have the government's case in chief." As to the latter, the court believed that waiting to rule on the motion "essentially cures the government's objection here on timelines" by giving the prosecution the opportunity to present evidence that "might[] . . . vindicate their opposition to the motion to

<hr>

defendant pleads that he or she has already been convicted . . . of the offense charged, by the judgment of the court of _____ (naming it), rendered at _____ (naming the place), on the _____ day of _____.' "

The People argued that a judgment is not required, citing *People v. Goldstein* (1867) 32 Cal. 432, 433 ("Nor is it necessary that a judgment should have been pronounced upon the conviction to make the plea of former conviction good"). DePape in turn argued that *Goldstein* predated the Penal Code.

[12]  The court recited the chronology in some detail, observing that the case was assigned for trial five months after the federal jury verdicts, then over the course of the next month the court and counsel had multiple discussions, pretrial hearings were held and jury selection began.

dismiss." The court believed its approach was the "better course of action . . . consistent with law and . . . basic fairness to both sides."

Overall, the court's remarks indicate that its wish for a better understanding of the prosecution's theory of the case was not the independent driving force that DePape attempts to portray. Additionally, while DePape did request a continuance, which would have delayed the selection and swearing of jurors, he did so directly in response to the People's motion to amend the information, arguing that the new charge "significantly affects how we may or may not defend this case" and "[w]e need time to restrategize our defense.

In any event, we dismissed DePape's motion to dismiss on the ground that he waived jeopardy in the face of an argument that does not fundamentally differ from the one he now offers. The motion to dismiss argued DePape did not waive his double jeopardy rights in part because the point at which jeopardy attached was determined by the trial court's "independent" action in concluding it "could only rule" on the motion after the facts were developed at trial. His present argument differs only in his framing of it in terms of "superseding cause." But this framing imposes an even more imposing hurdle, as the superseding cause analysis amounts to a more stringent form of the same point. The superseding cause test is quite stringent: "In law, the term 'superseding cause' means 'an independent event [that] intervenes in the chain of causation, producing harm of a kind and degree so far beyond the risk the original [wrongdoer] should have foreseen that the law deems it unfair to hold him responsible.' (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 573, fn. 9.)" (*People v. Sanchez* (2001) 26 Cal. 4th 834, 855, (conc. opn. of Kennard, J.).) " '[I]n order to be "independent" the intervening cause must be "unforeseeable . . . an

extraordinary and abnormal occurrence, which rises to the level of an exonerating, superseding cause." ' " (*People v. Cervantes* (2001) 26 Cal.4th 860, 871.) To the extent these principles apply in the context of court and counsel's actions in law and motions proceedings—a point the People question—we are not persuaded they warrant reconsideration of our denial of the motion to dismiss this appeal.

## II.

### *Double Jeopardy Analysis*

#### A. Governing Principles

Section 656 provides: "Whenever on the trial of an accused person it appears that upon a criminal prosecution under the laws of the United States, or of another state or territory of the United States based upon the act or omission in respect to which he or she is on trial, he or she has been acquitted or convicted, it is a sufficient defense."[13]

" 'Under this section, a defendant may not be convicted after a prior acquittal or conviction in another jurisdiction if all the acts constituting the offense in this state were necessary to prove the offense in the prior prosecution [citation]; however, a conviction in this state is not barred where the offense committed is not the same act but involves an element not present in the prior prosecution.' " (*People v. Homick* (2012) 55 Cal.4th 816, 842 (*Homick*), quoting *People v. Belcher* (1974) 11 Cal.3d 91, 99.) " '[E]lement' in this formulation refers only to *conduct* required to prove the

---

[13] "[P]rosecution and conviction for the same act by both state and federal governments are not barred by the Fifth Amendment guarantee against double jeopardy," but this rule "does not preclude a state from providing greater double jeopardy protection than is provided by the federal Constitution under decisions of the United States Supreme Court." (*People v. Comingore* (1977) 20 Cal.3d 142, 145 (*Comingore*).)

charges, not to criminal intent or other nonact elements." (*Homick,* at p. 843.) "[S]ection 656 applies when the *physical conduct* required for the California charges has previously been the subject of an acquittal or conviction in another jurisdiction, regardless of whether the two charges have different requirements as to intent or other nonact elements. (*Comingore, supra,* 20 Cal.3d at pp. 146-148; *Belcher, supra,* 11 Cal.3d at pp. 99-100.)" (*Homick,* at p. 840.)

A few cases help illustrate the parameters. *Homick* addressed the requirement that the act upon which a double jeopardy claim is based be *necessary* for the earlier conviction. *Homick* rejected the defendant's claim that his federal court convictions of interstate murder for hire barred subsequent convictions in California for first degree murder with a special circumstance of lying-in-wait because the latter required proof of conduct that was not necessary for proof of the former. (*Homick*, *supra,* 55 Cal.4th at pp. 837-838.) *Homick* explained, "The lying-in-wait special circumstance (§ 190.2, subd. (a)(15)) requires proof the killer concealed his or her purpose, watched and waited a substantial time for the opportunity to act, and thereafter launched a surprise attack on the victim from a position of advantage. (*People v. Bonilla* (2007) 41 Cal.4th 313, 330.) No such conduct was required under title 18 United States Code former section 1952A, which was satisfied by proof defendant traveled between states in order to commit a murder for hire, and death resulted." (*Id.* at p. 844.)

Moreover, *Homick* found it of no significance that the federal prosecutor in fact proved conduct constituting lying in wait. (*Homick, supra,* 55 Cal.4th at p. 844.) The court emphasized, "Nor did the federal *indictment* against defendant charge any of the conduct constituting lying in wait . . . . That the federal prosecutor, like the state prosecutor afterward, proved

14

defendant ambushed and killed the [victims] in their garage [citation] is of no import, as proof of an ambush was not '*necessary* to prove the offense in the prior prosecution.' " (*Ibid.*)

*Belcher* illustrates the distinction between an act necessary for conviction and a nonact element of the offense. *Belcher* held the defendant's acquittal in federal court of assault with a deadly weapon on a federal officer was a defense to conviction in state court for assault with a deadly weapon but not to counts of robbery arising from the same incident. (*Belcher, supra,* 11 Cal.3d at p. 99.) As to the assault, the People argued the federal acquittal did not bar a state conviction because the federal offense required proof that the assault was on a federal officer, an element not required for the state offense. (*Id.* at pp. 99-100.) *Belcher* rejected this argument because "conviction of the federal offense required proof of no additional *act* on the part of defendant; it merely required proof of the status of the victim for jurisdictional purposes." (*Id.* at p. 100.) The robbery convictions, however, were not barred because they required "at the very least proof of an important additional act by defendant—the 'taking of personal property in the possession of another' (§ 211)—that need not be proved to establish the federal offense of assault with a deadly weapon upon a federal officer." (*Ibid.*)

*Belcher* used two cases involving the same defendant and underlying incident to "demonstrate the meaning to be given to the terms 'act or omission' as they are used in section 656." (*Belcher, supra,* 11 Cal.3d at p. 99.) In *People v. Candelaria* (1956) 139 Cal.App.2d 432 (*Candelaria I*), the defendant's federal court conviction for robbery of a national bank barred a subsequent state conviction for robbery of the same bank. (*Belcher,* at p. 98.) " 'The physical act or conduct of defendant in taking the money was the same whether the robbery be considered as a federal offense or a state offense. All

the acts constituting the state offense were included in the federal offense and were necessary to constitute the federal offense.  It is clear that, within the meaning of said section 656, the federal conviction was "founded upon the act" in respect to which the defendant was tried in the present case.' " (*Belcher,* at pp. 98-99, quoting *Candelaria I,* at p. 440.)  By contrast, in *People v. Candelaria* (1957) 153 Cal.App.2d 879 (*Candelaria II*), the court held the federal bank robbery conviction did *not* bar a subsequent state prosecution for burglary committed as part of the same incident.  (*Belcher,* at p. 99.) " 'The burglary act complained of in the present case, that is, the entering of the building with the intent to commit a theft, is not the same act complained of in the federal court, namely, that [the defendant] pointed a gun at the teller and by force and fear compelled her to deliver over to him certain monies.' " (*Ibid.,* quoting *People v. Candelaria II,* 153 Cal.App.2d at p. 884.)

*Comingore, supra,* 20 Cal.3d 142 further illustrates the distinction between the physical conduct required to prove an offense and additional nonact elements, in that case, the required mental state.  The defendant took a car without permission in California and drove it to Oregon, where he was apprehended and convicted of unauthorized use of a vehicle.  (*Id.* at p. 144.) The People conceded that the grand theft charges brought in California were based on the same physical conduct as the unauthorized use of a vehicle charge to which he had pled guilty previously in Oregon.  (*Id.* at pp. 144, 146.)  Thus, the sole question on appeal was whether the defendant's former conviction operated as a bar to his current one.  (*Id.* at p. 144.)  The People argued the Oregon conviction did not bar subsequent prosecution in California for grand theft auto and unlawful driving or taking of a vehicle because the California offenses required proof of intent to deprive the owner of the vehicle, which was not required for the Oregon offense.  (*Id.* at p. 146.)

16

*Comingore* rejected the view that intent is an element of "act" as used in section 656, explaining that because every crime requires a "joint operation of act and intent" (§ 20), intent "is an element of a crime or public offense, not of an act." (*Comingore,* at p. 148.) The California prosecution was barred by the Oregon conviction because the California offenses did not require proof of any additional physical act. (*Id.* at pp. 148-149.)

## B. Standard of Review

"When the double jeopardy question requires the trial court to resolve disputed facts, the appellate court reviews the case under the substantial evidence standard. (*People v. Batts* (2003) 30 Cal.4th 660, 682-683 [double jeopardy issue turned on question whether prosecution in previous trial intended to induce a successful mistrial motion].) But, when the facts are uncontradicted and different inferences cannot be drawn, the question of former jeopardy is one of law for the court to decide. (*People v. Vigghiany* (1960) 181 Cal.App.2d 621, 631 [defendant is entitled to a jury trial on question of former jeopardy].) Moreover, determination of whether double jeopardy applies in a case involving separate prosecutions of the same or similar conduct in different jurisdictions requires the court to compare and construe the applicable criminal statutes from both jurisdictions. (See, e.g., *Comingore, supra,* 20 Cal.3d at pp. 144, 146 & fns. 1-3; [*People v.*] *Lazarevich* [(2001)] 95 Cal.App.4th [416,] 422-423.) The construction of a statute is also a question of law. (*People ex rel. Lockyer v. Shamrock Foods Co.* (2000) 24 Cal.4th 415, 432.) On appeal, we review questions of law de novo. (*In re Corrine W.* (2009) 45 Cal.4th 522, 529.)" (*People v. Davis* (2011) 202 Cal.App.4th 429, 438.) Here, the disputed issues are questions of law and we review them independently.

## C. Evidence Concerning the Federal Conviction

DePape's motion to dismiss required the trial court to determine and compare what physical conduct was necessary to prove the assault DePape was found guilty of in the federal case and what physical conduct would be necessary to prove the California offenses with which he was charged in present case. This determination necessarily required comparison of the statutory elements of each offense. (See, e.g., *Homick, supra,* 55 Cal.4th at p. 844 [discussing elements of federal and California offenses]; *Comingore, supra,* 20 Cal.3d at pp. 144, 146 [comparing elements of Oregon and California offense]; *Belcher, supra,* 11 Cal.3d at pp. 99-100 and fn. 7 [noting element required for California offense but not federal offense]; *People v. Bellacosa* (2007) 147 Cal.App.4th 868, 878 [comparing Nevada and California offenses].) It further required the court to consider the charging documents, jury instructions and verdicts in the federal case to identify the physical conduct relied upon to satisfy the statutory elements of the offense. (See, e.g., *Homick, supra,* 55 Cal.4th at pp. 838-839 [describing federal indictment, jury instructions and verdict]; *Belcher,* at p. 94 and fn. 2 [describing federal indictment and judgment]; *Candelaria I, supra,* 139 Cal.App.2d at pp. 434-435 [describing federal indictment].) The court then had to identify the physical conduct the California charges were founded upon. (See, e.g., *Bellacosa,* at p. 878 [describing People's theory as indicated in stipulated facts]; *Candelaria I,* at pp. 434-435 [describing information].)

The People argue the trial court had no competent evidence to determine what physical acts were the basis of the federal assault conviction. It was DePape's burden to establish the facts necessary to prove he was placed in former jeopardy. (*People v. Gonzalez* (2015) 241 Cal.App.4th 1103, 1108.) To do so, DePape asked the trial court to take judicial notice of

18

documents from the federal case that he submitted as exhibits to his motion to dismiss. The People did not object, noting the documents were official records filed in federal court, and the trial court took judicial notice of them. Based on these documents, as will be further discussed, DePape argues the federal assault conviction was founded on his act of striking Pelosi in the head with the hammer. As we will see, the People maintain the federal conviction establishes no more than that DePape swung the hammer toward Pelosi, not necessarily that the hammer actually struck Pelosi.

" 'Judicial notice is the recognition and acceptance by the court, for use by the trier of fact or by the court, of the existence of a matter of law or fact that is relevant to an issue in the action without requiring formal proof of the matter.' (2 Jefferson, Cal. Evidence Benchbook [(3d ed. 1997)] § 47.1, at pp. 1064-1065.)" (*Lockley v. Law Office of Cantrell, Green, Pekich, Cruz & McCort* (2001) 91 Cal.App.4th 875, 882.) " 'The court may in its discretion take judicial notice of any court record in the United States. [Citation.] This includes any orders, findings of facts and conclusions of law, and judgments within court records. [Citations.] However, while courts are free to take judicial notice of the *existence* of each document in a court file, including the truth of results reached, they may not take judicial notice of the truth of hearsay statements in decisions and court files.' " (*In re Vicks* (2013) 56 Cal.4th 274, 314, quoting *Lockley,* at p. 882.)

The People argue that the judicially noticed documents were "not necessarily" part of the record because DePape did not move to admit them "as *evidence*." Although the parties' competing arguments muddy the issues,[14] the dispute comes down to whether the judicially noticed documents

---

[14] DePape's response to the People's argument that the documents were not put into evidence—that he did not have to follow the "formalities"

19

were used in violation of hearsay rules. The People's suggestion that the documents were not admitted into evidence appears to address their objection to the contents of the documents being used for their truth; DePape's response—that the documents did not need to be admitted in the manner of evidence at trial—stems from his position that the documents' contents were *not* used for their truth.[15]

The People acknowledge that pursuant to Evidence Code section 452.5, subdivision (b), which has been interpreted as creating an exception to the hearsay rule (*People v. Duran* (2002) 97 Cal.App.4th 1448, 1461), "a certified

required for "introducing material evidence at the main trial" in seeking judicial notice—triggered a lengthy argument from the People to the effect that the Evidence Code is fully applicable to criminal cases and DePape's motion to dismiss was not subject to any statutory provision for relaxed evidentiary standards. This response is beside the point: Judicial notice is " 'a substitute for formal proof.' " (*Sosinsky v. Grant* (1992) 6 Cal.App.4th 1548, 1564, quoting 1 Witkin Cal. Evidence (3d ed. 1986) § 80, p. 74) and DePape simply argues the documents were being used in keeping with the proper parameters of judicial notice. The parties' dispute over whether the People forfeited hearsay objections by failing to identify portions of the judicially noticed material they believed to be inadmissible is irrelevant if DePape is correct that the documents were used for nonhearsay purposes.

[15] The People assert that exhibits to a motion are not part of the record unless expressly admitted by the court, citing *In re Rosenkrantz* (2002) 29 Cal.4th 616, 675. *Rosenkrantz* explained that exhibits to the petition, return and traverse in a habeas corpus proceeding "do not constitute evidence, but rather supplement the allegations to the extent they are incorporated by reference." If the petitioner's entitlement to relief depends on resolution of disputed issues of fact, there is an evidentiary hearing at which the exhibits to the pleadings "are subject to admission into evidence in accordance with generally applicable rules of evidence." (*Ibid.*) But *Rosenkrantz* addressed an entirely different type of pleading. Since judicial notice *substitutes* for formal proof (*Sosinsky v. Grant, supra,* 6 Cal.App.4th at p. 1564), once a request for judicial notice is granted, the judicially noticed exhibits do not need to be formally admitted into evidence.

20

official record of conviction is admissible to prove not only the *fact* of a conviction, but also that the offense reflected in the record occurred."[16]  They argue, however, that the jury verdict and judgment supply no "act evidence" and the conviction establishes only that DePape swung the hammer toward Pelosi because an assault does not require that the defendant actually make physical contact with the victim.  (*United States v. Lewellyn* (9th Cir. 2007) 481 F.3d 695, 697.)

In the abstract, assault does not require proof that the defendant made physical contact with the victim.  The Ninth Circuit Court of Appeals explained, "Because [18 U.S.C.] § 113 does not define 'assault,' we have adopted the common law definitions:  (1) 'a willful attempt to inflict injury upon the person of another,' also known as 'an attempt to commit a battery,' or (2) 'a threat to inflict injury upon the person of another which, when coupled with an apparent present ability, causes a reasonable apprehension of immediate bodily harm.' "  (*United States v. Lewellyn*, *supra*, 481 F.3d at p. 697, quoting *United States v. Dupree* (9th Cir. 1976) 544 F.2d 1050, 1051, fn. omitted.)

In keeping with their reliance on this definition of assault, the People point to an allegation in the introductory portion of the indictment that DePape "swung the hammer abruptly and forcefully at Mr. Pelosi."  As the People acknowledge, however, the indictment's charging language described the hammer striking Pelosi's head:  Count two alleged that DePape "willfully

---

[16]  Evidence Code section 452.5, subdivision (b)(1) provides that a certified official record of conviction is admissible under the business records exception to the hearsay rule "to prove the commission, attempted commission, or solicitation of a criminal offense, prior conviction, service of a prison term, or other act, condition, or event recorded by the record."

and unlawfully assaulted Paul Pelosi, the spouse and member of the immediate family of Nancy Pelosi, a United States official as that term is defined in Title 18, United States Code, Section 115(c)(4), *by means of hitting a hammer on Mr. Pelosi's head*, with intent to impede, intimidate, interfere with and retaliate against Nancy Pelosi while she was . . . engaged in and on account of the performance of her official duties." (Italics added.) Consistent with this charge, the jury was instructed that for DePape to be found guilty of the assault charged in count two, the government was required to prove beyond a reasonable doubt that DePape "forcibly assaulted a member of the immediate family of a United States official," and that "[t]here is a forcible assault when one person intentionally strikes another." Nothing in the jury instruction defining this offense suggested the jury could find DePape committed the charged assault without striking Pelosi. The obvious conclusion is that the federal conviction was based on DePape striking Pelosi's head with a hammer.

The People dispute DePape's reliance on the charging language of the indictment and jury instructions, arguing that because Evidence Code section 452.5 does not apply to "the language" of the indictment, the most that can be discerned from the indictment "is that it existed."[17] This

---

[17] The People maintain that the trial court recognized the "fundamental evidentiary deficiency" left by the record of conviction when, in discussing the People's argument that the federal assault conviction did not require proof that DePape actually struck Pelosi with the hammer while conviction of attempted murder would require showing multiple blows, the court commented, "While the evidence of a second blow established an independent act in the state case not part of the federal action, I'll say for the record it's not 100 percent clear what the federal evidence was about what happened to Mr. Pelosi, nonetheless, I'm not persuaded by [the prosecutor's] argument on behalf of the prosecution that I must separate the first blow to Mr. Pelosi from the second blow." We see little significance in the court's

22

argument might be correct if DePape sought to use the indictment to prove the truth of its allegations. But he did not: DePape offered the indictment only to prove what was alleged, not whether the allegations were true. This nonhearsay use of the indictment was permissible. (See *Hart v. Darwish* (2017) 12 Cal.App.5th 218, 224-225 [no violation of hearsay rule in judicial notice of prior court ruling to determine basis of ruling, not truth of factual findings]; *People v. Munoz* (2005) 129 Cal.App.4th 421, 430-431 [judicial notice of fact of prior sexually violent predator finding if there was a *"legal consequence"* to the fact of that prior finding, but it could not be considered to show truth of the prior finding that defendant had a mental condition that rendered him dangerous]; *Kilroy v. State of California* (2004) 119 Cal.App.4th 140, 147-148 [distinguishing truth of court's factual finding and fact that finding was made]; *Magnolia Square Homeowners Assn. v. Safeco Ins. Co.* (1990) 221 Cal.App.3d 1049, 1056-1057 [upholding judicial notice of complaint's allegations of structural defects to show notice for purposes of statute of limitations, not for truth of the allegations].)

DePape describes the judicially noticed documents as containing the "juridical operative facts" underlying the parties' double jeopardy arguments rather than "contestable historical facts" as to which the hearsay rule would apply. As explained in 1 Witkin, California Evidence (6th ed. 2025) Hearsay, § 36, " 'There is a well-established exception or departure from the hearsay rule applying to cases in which the very fact in controversy is whether certain things were said or done and not as to whether these things were true or

---

comment. The court's reference to evidence presented in the federal trial was an aside to the court's point, which was that it was not required to view discrete blows within seconds as separate acts for purposes of the section 656 analysis.

23

false, and in these cases the words or acts are admissible not as hearsay but as original evidence.' [Citations.] [¶] In these situations, the words themselves, written or oral, are 'operative facts,' and an issue in the case is whether they were uttered or written."

The People challenge DePape's application of this principle to the indictment as contrary to the California Supreme Court's denial of a request for judicial notice of a criminal indictment in *Voris v. Lampert* (2019) 7 Cal.5th 1141, 1147, fn. 5. *Voris* explained that although the court had "discretion to take judicial notice of the criminal indictment as a court record (Evid. Code, §§ 452, subd. (d), 459), . . . the truth of the matters alleged in the indictment is not the proper subject of judicial notice, and the existence of the indictment alone is irrelevant to our decision." (*Ibid.*) But DePape does not seek to rely on the indictment for the truth of its contents, and the *Voris* court's refusal to take judicial notice of the existence of an indictment that was not relevant to the case in no way suggests a court cannot take judicial notice of the existence of an indictment where, as here, its existence is directly relevant to the issues.[18]

In short, judicial notice of the indictment did not permit DePape or the trial court to rely on its allegations as true. But it was not improper to rely on those allegations simply to establish what acts were *alleged* as

---

[18] The plaintiff in *Voris* had prevailed in prior litigation against companies that had terminated his employment after he voiced concerns about alleged financial improprieties, but he had not been able to collect on the judgment. (*Voris, supra,* 7 Cal.5th at pp. 1144-1145.) The issue in the current case was the cognizability of a novel theory by which he sought to recover the previously awarded damages. (*Id.* at pp. 1144-1147.) All the court said about the indictment the plaintiff sought to have judicially noticed was that it was mentioned in newspaper articles the court was also asked to judicially notice. (*Id.* at p. 1147, fn. 5.)

constituting the offense. Similarly, the jury instructions could be used to show what the jury was directed to determine. Reliance on the indictment, jury instructions, verdict and judgment to show DePape was charged and convicted of assault by striking Pelosi with the hammer was a permissible use of the judicially noticed documents and sufficient to establish that the federal conviction was founded on DePape's act of striking Pelosi in the head with a hammer.

Our dissenting colleague reads *Homick, supra,* 55 Cal.4th 816, as requiring consideration of all the statutory elements of the federal and state offenses rather than the physical act or conduct necessary to prove those elements. (See, e.g., conc. & dis. opn., *post*, at pp. 2, 5.) But *Homick* emphasized that the test for application of section 656 turns on conduct: In determining whether a California prosecution may proceed because " 'the offense committed is not the same act but involves an element not present in the prior prosecution,' " the court explained, " 'element' . . . refers only to *conduct* required to prove the charges, not to criminal intent or other nonact elements." (*Homick,* at p. 843.)

We fail to see how a focus on the statutory elements of the offenses, divorced from any factual context, allows a court to identify the "act or omission in respect to which [the defendant] is on trial" and "has been acquitted or convicted" in the other jurisdiction. (§ 656.) The statutory elements of an offense alone do not necessarily or fully identify the physical conduct underlying those elements in a particular case. Absent the information supplied by material such as charging documents, instructions and verdicts in the first case or anticipated proof in the second, it would not be possible to determine even whether two prosecutions involved the same incident, much less the same underlying physical conduct. Here, the federal

25

indictment, instructions and verdict tell us what conduct the jury was required to find in order to render its verdict, while the People's arguments in the trial court tell us what conduct they intended to prove in order to establish the elements of the charged offenses.

Contrary to the dissent's characterization, we do not suggest the section 656 analysis depends on the particular evidentiary showing in either prosecution. We are cognizant of the *Homick* court's admonition our colleague emphasizes, that "[a] prior prosecution is not 'founded' or 'based,' within the meaning of section 656, on every piece of conduct shown by the evidence at the earlier trial. Were that the rule, the entire course of criminal conduct that led to the earlier charges would be effectively protected from prosecution in California . . . ." (*Homick*, 55 Cal.4th at p. 844.) Our focus is not on the evidence actually presented in the federal case or the People's case in chief in the trial court but rather on the conduct necessary to establish the physical act elements of the respective offenses as alleged by the prosecution.

**D. Analysis of the Dismissed Counts**

DePape was convicted in the federal case of assaulting Pelosi, an immediate family member of a federal official (18 U.S.C. § 115(a)(1)(A)), using a dangerous weapon, a hammer. All the counts dismissed in the present case were based on DePape striking Pelosi with the hammer. Count 1 alleged willful, deliberate and premeditated attempted murder perpetrated by means of the hammer blow; count 3 alleged elder abuse based on the injury inflicted by the blow, and count 4 alleged assault with a deadly weapon, the hammer. The People argue, however, that while these three counts "all have assaultive conduct as the core of the charges," each required proof of a physical act that was not required to be proven for the federal assault conviction.

### 1. *Attempted Murder*

Attempted murder requires proof that the defendant "took at least one direct but ineffective step toward killing" another person and "intended to kill" that person. (CALCRIM No. 600.) Willful, deliberate and premeditated attempted murder further requires proof that the defendant "intended to kill when [he] acted," "carefully weighed the considerations for and against [his] choice and, knowing the consequences, decided to kill," and "decided to kill before completing the act[s] of attempted murder." (CALCRIM No. 601 [defining "acted *willfully*," "*deliberated*" and "acted with *premeditation*"].) The People draw two distinctions between these requirements and the proof necessary for the federal assault conviction. First, the People argue the federal assault conviction did not require proof that DePape actually struck Pelosi, while they would need to prove multiple hammer blows to show DePape took a direct but ineffective step toward killing Pelosi. Second, the People argue the federal assault conviction did not require the proof of willfulness, deliberation and premeditation necessary for conviction of attempted murder. Neither of these distinctions is persuasive.

The charged attempted murder in the present case was clearly based on DePape striking Pelosi in the head with a hammer, as this was the physical act the People alleged constituted the "direct but ineffectual step toward killing" required for that offense. We have already rejected the People's argument that the federal assault conviction did not require proof that DePape actually struck Pelosi with the hammer. The People argue, however, that the attempted murder count would require proof of multiple hammer blows while the federal assault conviction required at most a single blow, since the federal indictment was silent as to whether there were "multiple hits." The People raised this point below in their written opposition

27

to the motion to dismiss, and at the hearing disagreed with the trial court's suggestions that the charged assaultive crimes in the present case involved "the same alleged blow with the hammer to Mr. Pelosi's head" and that one hammer blow was sufficient to constitute a step toward killing for attempted murder.

While proof of multiple blows would certainly help prove intent to kill, the application of section 656 depends on what *physical acts* were *necessary* to each conviction. (*Homick, supra,* 55 Cal.4th at pp. 840-841.) The People do not explain why proof of more than one hammer strike would be *necessary* to establish the "direct but ineffective step toward killing" another person required for conviction of attempted murder. The assault charged in the federal case (as defined by the indictment and jury instructions) and the attempted murder charged in the present case (as defined by the statutory elements and prosecutor's theory of the offense) each required proof that DePape struck Pelosi's head with a hammer at least once, and not necessarily more than once. Accordingly, the number of hammer strikes shown by the evidence is irrelevant and the People's reliance on a second hammer strike as an additional act precluding application of section 656 is unavailing. As the physical act *necessary* for each offense was the same regardless of other nonact elements of the offenses and conviction of the charged attempted murder did not require proof of a *physical act* beyond that hammer strike, DePape was convicted in federal court of the *physical act* "in respect to which he . . . is on trial" in the present case. (§ 656; *Homick,* at p. 840 [§ 656 "applies when the *physical conduct* required for the California charges has

28

previously been the subject of an acquittal or conviction in another jurisdiction"].)[19]

As for willfulness, premeditation and deliberation, the People are of course correct that proof of these elements is required for the offense of attempted murder and were not required for the federal assault conviction. Contrary to the People's position, however, we conclude these are "nonact" elements that do not defeat the application of section 656. (*Homick, supra,* 55 Cal.4th at p. 840.)

Citing *Bellacosa, supra,* 147 Cal.App.4th at page 876, the People contend that "physical act evidence" was necessary to establish that DePape acted willfully, with premeditation and deliberation. The defendant in *Bellacosa* evaded pursuing officers in California by driving into Nevada, attempted to evade Nevada officers who continued the pursuit, and was convicted in Nevada of driving under the influence (DUI) and attempting to evade officers. (*Bellacosa,* at p. 871.) *Bellacosa* held that the Nevada convictions did not bar prosecution in California for DUI and eluding a peace officer while driving with willful and wanton disregard for safety because the physical acts committed in California were not the same physical acts

---

[19] The People argue the trial court erroneously viewed DePape's acts as a continuous course of conduct, an analysis that has been held inapplicable to section 656. (*Homick, supra,* 55 Cal.4th at p. 844; *Belcher, supra,* 11 Cal.3d at p. 98.) The trial court, assuming the two separate wounds Pelosi sustained indicated two separate hammer blows, viewed those blows as so close in time that they constituted a single assault—"same time, same place, same weapon, same men, fraction of a second, the same act, and I do consider the two blows essentially to be one continuous act." Since neither the federal assault conviction nor the charged count of attempted murder required proof of more than one hammer strike, we need not resolve whether a defendant's infliction of two blows on the same victim in immediate succession is properly viewed as a single assaultive act or a continuous course of conduct.

29

committed in Nevada: "His California crimes were complete, and came to an end, when he entered Nevada. His actions in California were neither necessary nor sufficient to prove his Nevada offenses, and his actions in Nevada were neither necessary nor sufficient to prove his California offenses." (*Id.* at p. 872.)

The *Bellacosa* court acknowledged that *Comingore, supra,* 20 Cal.3d 142, treated the defendant's driving offenses in California and Oregon as based on the same physical act. (*Bellacosa, supra,* 147 Cal.App.4th at p. 877.) But *Bellacosa* did not see *Comingore* as supporting the conclusion that the defendant's California and Nevada offenses were based on the same physical act because the *Comingore* court did not analyze the issue; it simply accepted the prosecutor's concession that the charges in both states were based on the same physical act and "the ratio decidendi of the [*Comingore*] decision was that in determining whether a prior conviction or acquittal bars a California prosecution, courts disregard state of mind elements of the offenses and look to the physical acts at issue." (*Bellacosa,* at p. 878.)

As an additional reason for finding section 656 did not bar the prosecution in *Bellacosa,* the court explained that the statutes defining the offenses charged in Nevada and in California required different conduct. (*Bellacosa, supra,* 147 Cal.App.4th at p. 878.) The defendant was charged in Nevada with an offense that "is committed by 'the driver of a motor vehicle who willfully fails or refuses to bring his vehicle to a stop, or who otherwise flees or attempts to elude a peace officer in a readily identifiable vehicle of any police department or regulatory agency, when given a signal to bring his vehicle to a stop.' (Nev.Rev.Stats., § 484.348(1).) . . . [¶] In California, he was charged with . . . a crime that requires driving with willful and wanton

30

disregard for the safety of persons and property, which may be shown through proof of three or more violations that are assigned a traffic violation point count under Vehicle Code section 12810. (Veh. Code, § 2800.2, subd. (b).) The stipulated facts demonstrate that the prosecution in California will seek to prove that, in addition to driving under the influence of alcohol, defendant sped, made illegal lane changes, illegally passed traffic in the center turn lane, and ran a red light. These acts were performed entirely in California. They were not charged in Nevada and were in fact irrelevant to the Nevada charge. The physical acts that are at issue in California, but were not at issue in Nevada, preclude application of the prior conviction or acquittal defense." (*Bellacosa,* at p. 878.)

The People rely on *Bellacosa* to argue that the trial court erred in treating the willfulness, premeditation and deliberation element of attempted murder as a mental state excluded from the section 656 analysis because "physical act evidence" is required to prove that DePape acted willfully, with premeditation and deliberation. We do not see *Bellacosa* as supporting the proposition that physical acts used as evidence of a mental state are necessarily acts "in respect to which [the defendant] is on trial." (§ 656.)

Vehicle Code section 2800.1, at issue in *Bellacosa,* in effect defines the mental state required for the offense (willful and wanton disregard for safety) by reference to specific conduct; the People's reference to the "acts showing willful and wanton *conduct*" in *Bellacosa* appears to acknowledge this focus on conduct in that case. (Italics added.) Premeditation, by contrast, is a " 'mental state [that] is uniquely subjective and personal' " and distinct from conduct. (*People v. Gastelum* (2020) 45 Cal.App.5th 757, 767, quoting *People v. Chiu* (2014) 59 Cal.4th 155, 166.) *Gastelum* discussed this point in rejecting the argument that the defendant could not be convicted of lying-in-

31

wait murder as an aider and abettor under the natural and probable consequences doctrine.[20] (*Id.* at pp. 762, 768-769.) *Gastelum* explained that "lying-in-wait murder requires proof of certain conduct, rather than a 'uniquely subjective and personal' mental state." (*Gastelum,* at p. 768.) "A lying-in-wait murder is murder of the first degree based on the objective facts of the perpetrator's conduct; it does not turn on the vagaries of the perpetrator's mind. . . . [¶] One type of murder depends exclusively on the perpetrator's mental state; the other depends on the factual circumstances of the killing." (*Id.* at p. 769.)[21]

The People challenge DePape's reliance on *Gastelum* for what they describe as the proposition that "the willful, premeditated and deliberate allegation is exclusively a mental state that would render the additional physical act evidence in support of that mental state outside of the scope of the inquiry under section 656." Maintaining that *Gastelum* does not answer the question whether the "willful, deliberate, premeditation allegation is a

---

[20] The defendant's argument was based on *People v. Chiu, supra,* 59 Cal.4th at page 166, which held that a defendant cannot be convicted of *premeditated* murder as an aider and abettor under the natural and probable consequences doctrine. *Gastelum* found the principles underlying *Chiu* inapplicable to lying in wait murder. (*Gastelum, supra,* 45 Cal.App.5th at pp. 762, 766-769.)

[21] DePape argues the court in *Homick* made a similar distinction, finding additional conduct would be needed to prove a lying-in-wait special circumstance but not to prove a premeditation special circumstance. *Homick* makes clear that lying in wait requires proof of physical acts, but the court did not discuss the issue with respect to premeditation. The *Homick* court's only reference to premeditation was a footnote observing that the jury was instructed on both lying in wait and premeditation as theories of first degree murder, which was appended to the court's statement that with lying in wait at issue as both a theory of first degree murder and a special circumstance, the defendant was "indisputably 'on trial' for murder by means of lying in wait." (*Homick, supra,* 55 Cal.4th at p. 845 & fn. 20.)

mental state as addressed in *Comingore*," the People urge us to take guidance from *Bellacosa* instead.[22]

The People's position, as we understand it, is that for purposes of section 656, a defendant is on trial "in respect to" (§ 656) a physical act when that act is used to prove a nonact element of the offense. We are not convinced. The People urge that "while *conduct* may not be *required* to prove willful, premeditation, and deliberation," "physical act evidence" can be used for this purpose, and "in this case there is additional act evidence that turns the attempted murder here into an attempted murder that was willful, premeditated and deliberate."[23] But this does not mean physical acts used as

---

[22] As earlier described, the mental state referred to in *Comingore* was intent to deprive the owner of the vehicle temporarily or permanently, which was an element of the California offense but not the Oregon offense. (*Comingore, supra,* 20 Cal.3d at p. 146.)

[23] The People cite *People v. Anderson* (1968) 70 Cal.2d 15 as showing that conduct can be used to establish that an attempted murder was willful, premeditated or deliberate even though it may not be required. *Anderson* discussed "three basic categories" of evidence the court had found sufficient to sustain a finding of premeditation and deliberation: "facts about how and what defendant did *prior* to the actual killing"; "facts about the defendant's *prior* relationship and/or conduct with the victim"; and "facts about the nature of the killing." (*Id.* at pp. 26-27.) As DePape points out, since *Anderson,* the court has "emphasized that its guidelines are descriptive and neither normative nor exhaustive, and that reviewing courts need not accord them any particular weight." (*People v. Halvorsen* (2007) 42 Cal.4th 379, 420.)

In the trial court, the People relied on *People v. Anderson* to argue that planning as a prosecution theory must be proven through acts, and such acts were necessary in the present case but not in the federal case. The People do not make clear whether they believe premeditation and deliberation can *only* be proven in the present case with "additional act evidence." Nor is it clear whether their position that "physical act evidence" constitutes the physical act "in respect to which [the defendant] is on trial" (§ 656) is limited to cases where an element like premeditation can *only* be proven by conduct or applies whenever such evidence is present. The latter, which is suggested by

33

evidence of a nonact element of the offense for which a defendant is on trial offense are themselves acts upon which the prosecution is founded. Intent, or other nonact elements of an offense, often must be proved with evidence of physical conduct. If it is enough to say such evidentiary physical conduct is the "act . . . in respect to which" the defendant is on trial, the distinction between act and nonact elements of an offense emphasized in cases such as *Homick, supra,* 55 Cal.4th at page 840, would become irrelevant.

The fact that premeditation may be proven with evidence of physical conduct does not distinguish it from other mental states. *Comingore* explained that intent "is an element of a crime or a public offense, not of an act" because, under section 20, " '[i]n every crime or public offense there must exist a union, or joint operation of act and intent, or criminal negligence.' " (*Comingore, supra,* 20 Cal.3d at p. 148.) Under the People's reasoning, the application of section 656 would turn not on "the *act or omission* in respect to which" the defendant is on trial but on the *evidence* used to prove the mental state required to establish the *offense* for which the defendant is on trial.

*Homick* explained that although the prosecutor in the federal trial in fact proved acts constituting lying in wait, those acts were not necessary to support the federal conviction and therefore did not alter the conclusion that the California prosecution was not barred because proof of lying in wait *was* necessary to establish the California offense. (*Homick, supra,* 55 Cal.4th at

---

their statement that "in this case there is additional act evidence that turns the attempted murder here into an attempted murder that was willful, premeditated and deliberate," raises the question how to determine when "physical act evidence" is *necessary* to prove premeditation or another mental state, rather than a matter of prosecutorial choice, and the untenable possibility of a prosecutor's choice about how to prove premeditation determining whether the prosecution violates section 656.

34

p. 844.)  Conversely, the fact that a mental state—here, premeditation and deliberation—*may* be proven with "physical act evidence" does not mean the physical acts used as evidence are *necessary* to the conviction in the sense that they constitute the "act . . . in respect to which [the defendant] is on trial."  (§ 656.)  Because the dispositive consideration for application of section 656 is physical conduct, not "intent or other nonact elements" (*Homick,* at p. 843), the premeditation necessary to turn an assault into an attempted premeditated murder does not determine whether the two prosecutions are "based upon" the same act within the meaning of section 656.

We recognize this focus on the physical act upon which a prosecution is based has the effect in the present case of barring the state from pursuing charges of an offense California has deemed serious enough to warrant a life sentence.  (§ 664, subd. (a).)  As *Homick* explained, when double jeopardy issues arise from prosecutions by different sovereign governments, "the interest of each in punishing criminal conduct as it finds fitting" comes into play.  (*Homick, supra,* 55 Cal.4th at pp. 845-846.)  "Constitutionally, this consideration motivates the dual sovereignty doctrine, under which double jeopardy protection is withdrawn entirely from the second prosecution."  (*Id.* at p. 846.)  Section 656 "restores" double jeopardy protections "only when the conduct charged in California has already been the subject of a completed federal or sister-state prosecution."  (*Homick,* at p. 846.)

As *Homick* also explained, a government's interest in separate prosecution is particularly strong when it charges conduct triggering its most severe penalties and "that particular conduct has not been the subject of a prior federal or sister-state prosecution."  (*Homick, supra,* 55 Cal.4th at p. 846.)  In *Homick,* the lying-in-wait special circumstance that made the

charged murder "so heinous as to merit" California's "most severe punishments, death and life in prison without the possibility of parole," required proof of physical conduct (that "the killer concealed his or her purpose, watched and waited a substantial time for the opportunity to act, and thereafter launched a surprise attack on the victim from a position of advantage") that the federal offense did not require.  (*Id.* at p. 844.)

Our dissenting colleague suggests *Homick*'s discussion about a government's interest in prosecuting a serious offense should lead us to interpret the intent element for first degree attempted murder as a nonact element akin to the lying-in-wait special circumstance at issue in *Homick*. (Conc. & dis. opn., *post*, at pp. 20-21.)  But that discussion pertained to its holding that a special circumstance charged in a state offense would be "conceptualized, for double jeopardy purposes, as a greater offense (inclusive of first degree murder) of first degree murder by means of lying in wait." (*Homick, supra,* 55 Cal.4th at p. 845.)  The analysis rested on the defendant having been charged with conduct that made him eligible for the death penalty or life in prison without parole and had not been the subject of a federal or sister state prosecution.  (*Id.* at p. 846.)

Nothing in *Homick* suggests the heinousness of the crimes charged or relative strength of the state and federal interests in prosecuting the offense is relevant to application of the double jeopardy statute for any other offense. Nor did the court in *Homick* consider the *intent* elements of the state and federal crimes in applying section 656 as our colleague suggests we should do. Rather, it held, "[t]he application of section 656" to the case before "*turns on whether the California charges against defendant required proof of conduct that was not required for conviction of the earlier charges.*"  (*Homick, supra,* 55 Cal.4th at p. 843, italics added.)  Answering in the affirmative, it

described the *conduct* that the special circumstance of lying in wait requires that the prior federal charge and conviction of interstate murder for hire did not: specifically, the killer's concealment of his purpose, watching and waiting for the opportunity to act, and launching a surprise attack on the victim. (*Id*. at p. 844.)

In the present case, the *physical conduct* required to prove the charged attempted murder—striking Pelosi's head with the hammer—was the same physical conduct required to prove the federal assault charge, even though other elements of the charged offense—intent to kill, premeditation, deliberation—were not required for the federal offense, and even though the penalty for the state offense exceeds that for the federal one. Section 656 expressly provides a defense to prosecution for an "act or omission" for which the defendant has been prosecuted in another jurisdiction, and our high court has interpreted the statutory language as referring to "physical conduct" but not "nonact elements." (*Homick, supra,* 55 Cal.4th at p. 840.) We believe the statutory language and judicial precedent compel the conclusion that section 656 bars prosecution for the charged attempted murder. If this interpretation is not correct, we must leave it to the California Supreme Court to clarify its interpretation or to the Legislature to amend the statute.[24]

---

[24] The dissent sees us as focusing on the evidence at trial to reach a conclusion that will result in precluding prosecution in California for any crime of violence based upon the same assaultive conduct as an offense in another jurisdiction. (Conc. & dis. opn., *post*, at p. 8.) Aside from our disagreement with the characterization of the nature of our analysis, we do not share the dissent's assumption as to its consequence. We conclude the attempted murder charged here requires no physical act other than the physical act DePape's federal assault conviction was based upon. We see no reason to assume this scenario of a single identical act as the necessary basis of foreign and California crimes will arise whenever a violent crime as

## 2. *Elder Abuse*

DePape was charged with elder abuse under section 368, subdivision (b)(1), which, as relevant here, applies to a person "who knows or reasonably should know that a person is an elder or dependent adult and who, under circumstances or conditions likely to produce great bodily harm or death, willfully causes or permits any elder or dependent adult to suffer, or inflicts thereon unjustifiable physical pain or mental suffering . . . ." The People contend that several "acts and separate requirements of proof" necessary to establish this offense differ from the federal crimes for which DePape was convicted. Specifically, the People refer to proof that DePape

---

defined in our state follows an assaultive crime in another jurisdiction. Our analysis follows the language of section 656 as interpreted by our high court. If in the view of the Legislature this analysis is incompatible with California's interest in prosecuting violent crime, it has demonstrated it knows how to address the issue—as described in our dissenting colleague's discussion of the amendment to section 656 in response to Mexico's refusal to extradite accused murderers who fled to that country. (Conc. & dis. opn., *post*, at pp. 21-22, fn. 8.)

Although penalties are not directly relevant to the analysis where two prosecutions are founded on the same physical conduct, we observe that while DePape has avoided the potential life sentence he would face if convicted of attempted willful, deliberate and premeditated murder (§ 664/187), he has not avoided significant punishment. The jury verdict and minutes of the federal sentencing, of which the trial court took judicial notice, are in the record on appeal, having been attached to an exhibit in support of the motion to dismiss filed in the trial court. They indicate that DePape was sentenced to a 30-year prison term for the federal assault conviction and a concurrent 20-year term for his federal conviction of attempted kidnapping. Additionally, records pertaining to DePape's pending appeal from convictions on the counts that continued to trial in the state case, of which we take judicial notice, show DePape was sentenced to life without parole for his conviction of kidnapping for ransom (§ 209, subd. (a)) and concurrent terms on the remaining counts.

38

"willfully . . . inflict[ed] . . . unjustifiable physical pain or mental suffering" on Pelosi, Pelosi was 65 years old or older and DePape knew or reasonably should have known this, and DePape acted "under circumstances or conditions likely to cause great bodily harm or death." (§ 368, subd. (b)(1).)

As with the attempted murder count, the People's argument rests on their view that the federal assault conviction was based on DePape's act of swinging the hammer and did not require proof of any contact with Pelosi. Again relying on *Bellacosa,* the People argue additional "physical act evidence" is necessary for the elder abuse charge, "which requires evidence as to the *result* of the attack" and circumstances of its commission.[25] The People urge that DePape's acts of arming himself with zip ties, breaking into the Pelosi home in the early morning hours and cornering Pelosi while he was sleeping in his bedroom constitute "additional evidence which would support the particular nuances of an elder abuse charge" but was not "necessary physical act evidence" for the federal assault charge.

Our analysis of the People's challenge to dismissal of the attempted murder count largely resolves their claim as to the elder abuse count as well. Contrary to the People's position, we have concluded that the federal assault conviction was founded upon DePape's act of striking Pelosi's head with the hammer and that physical acts used as evidence establishing an element of

---

[25] Again, physical acts used as evidence of elements of an offense necessarily themselves are not physical acts upon which the prosecution is based for purposes of section 656. The acts the People refer to would facilitate proof of DePape's intent and the circumstances of the offense, but the physical act *necessary* for conviction, the act "in respect to which" DePape was being prosecuted for elder abuse is the act of striking Pelosi's head with the hammer.

an offense are not necessarily themselves the acts "in respect to which [the defendant] is on trial." The People are correct that the federal assault conviction did not require proof that DePape actually injured Pelosi, while conviction of elder abuse under section 368, subdivision (b)(1) does. But this additional requirement for proof of the *offense* does not alter the *physical act* for which DePape was being prosecuted—the act of striking Pelosi's head with a hammer. Similarly, to the extent additional proof would be needed to establish that DePape struck Pelosi in circumstances likely to produce great bodily injury or death (circumstances arguably inherent in the act) the additional proof would not alter the fact that the physical act in respect to which DePape was on trial is the same act of striking Pelosi's head with a hammer as that upon which the federal conviction was founded.

### 3. *Assault with a Deadly Weapon*

The People argue proof of assault with a deadly weapon (§ 245, subd. (a)(1)), charged in count 4, requires evidence of physical acts beyond those necessary to the federal assault conviction in that, because a hammer is not inherently a deadly weapon, the state charge requires proof of the manner in which the hammer was used.

" 'As used in section 245, subdivision (a)(1), a "deadly weapon" is "any object, instrument, or weapon that is used in such a manner as to be capable of producing and likely to produce, death or great bodily injury." ' " (*In re B.M.* (2018) 6 Cal.5th 528, 532-533 (*B.M.*), quoting *People v. Aguilar* (1997) 16 Cal.4th 1023, 1028-1029 (*Aguilar*).) A hammer is not a deadly weapon per se. (*Aguilar,* at p. 1029 [object is deadly weapon as matter of law when "ordinary use for which [object] is designed" establishes character as such]; *People v. Burton* (2006) 143 Cal.App.4th 447, 457 [hammer as example of object that may be used as weapon but has nondangerous uses].) Objects

40

that are not deadly per se "may be used, under certain circumstances, in a manner likely to produce death or great bodily injury." (*Aguilar,* at p. 1029.) " 'In determining whether an object not inherently deadly or dangerous is used as such, the trier of fact may consider the nature of the object, the manner in which it is used, and all other facts relevant to the issue.' (*Aguilar*, at p. 1029.)" (*B.M.,* at p. 533.) "[T]he object alleged to be a deadly weapon must be used in a manner that is not only 'capable of producing' but also ' "*likely to produce* death or great bodily injury." ' (*Aguilar*, *supra*, 16 Cal.4th at p. 1029.)" (*Ibid*.) "[A] mere possibility of serious injury is not enough. But the evidence may show that serious injury was likely, even if it did not come to pass." (*Id.* at p. 535.) "The extent of any damage done to the object and the extent of any bodily injuries caused by the object are appropriate considerations." (*Id.* at p. 530.)

The People's argument again rests in part on its view that the federal assault conviction required only proof that DePape swung the hammer at Pelosi, making additional "act evidence" necessary to prove the hammer was used as deadly weapon. We have explained that in light of the language of the indictment, jury instructions and verdict, proof that DePape struck Pelosi in the head with a hammer was necessary for the federal assault conviction. For the same reason, the federal conviction also required proof that DePape struck Pelosi with a dangerous weapon. The jury was instructed that the government had to prove beyond a reasonable doubt that DePape "used a dangerous weapon during and in relation to the offense" and that "[a] hammer is a dangerous weapon if it is used in a way that is capable of causing death or serious bodily injury." The verdict reflects the jury's findings beyond a reasonable doubt that DePape committed the charged assault and used a dangerous weapon during and in relation to the assault.

41

The federal assault conviction did *not* require proof that the hammer was used in a way that was *likely,* not just *capable,* of causing death or serious bodily injury. (*B.M., supra,* 6 Cal.5th at p. 533.) But no additional *act* was necessary to prove the hammer was a deadly weapon as DePape used it in this assault. The injuries Pelosi suffered would inescapably establish that the hammer was used in a manner likely to cause at least great bodily injury. Again, the physical act the People would have to prove for a conviction under section 245, subdivision (a)(1) is the same assault on the same person as in the federal case.

### E. Decision by the Court

The People argue that the trial court erred by weighing the evidence in resolving DePape's motion to dismiss rather than having the jury decide his plea of double jeopardy. Although the People view the issue presented by DePape's motion as a pure question of law, they maintain the trial court assumed it was a question of fact and therefore should have submitted it to the jury. The People see the trial court's "unorthodox approach" of deferring decision of the motion to dismiss until after the prosecution presented its case in chief as violating rules governing the procedure and timing of pretrial motions[26] and exacerbating the court's "ultimate error in usurping the jury's role by resolving issues of fact. The People do not identify specific factual

---

[26] The People cite rules specifying that "[u]nless otherwise ordered or specifically provided by law, all pretrial motions . . . must be served and filed at least 10 court days . . . before the time appointed for hearing" (rule 4.111(a)); "[e]xcept for good cause, the court should hear and decide any pretrial motion in a criminal case before or at the readiness conference" (1 to 14 days before date set for trial (rule 4.112(b), (a)); and "[m]otions relating to pending informations, indictments or misdemeanor complaints . . . must be filed and served at least 15 calendar days before the date of the hearing" (Super. Ct. San Francisco County, Local Rules, rule 16.10(A)(2).)

issues they believe the court resolved; rather, as stated in their reply brief, they argue that "*to the extent* the trial court weighed facts," it erred in failing to submit the issues to the jury. (Italics added.)

Section 1041 provides that "[a]n issue of fact arises . . . [u]pon a plea of once in jeopardy" and, pursuant to section 1042, issues of fact must be tried by a jury in accordance with article 1, section 16, of the California Constitution. Accordingly, " 'where the issue of jeopardy is based on questions of fact, it is for the jury to decide. [citations.]' [Citations.]" . . . [¶] [U]sually, a plea of once in jeopardy does present an issue of fact. [Citations.] As a result, the issue of jeopardy is ordinarily submitted to the jury. . . . [¶] However, like many other questions of fact, the jeopardy determination can become a question of law when (1) the underlying facts are undisputed and (2) there is only one reasonable inference to be drawn from those undisputed facts." (*People v. Bell* (2015) 241 Cal.App.4th 315, 340-341.) " 'The determination of the *validity* of a claim of double jeopardy is a matter for the trial judge in the first instance. If there is no material issue of fact, the judge rules on the double jeopardy claim. If, however, a material issue of fact exists, then it is for the jury to resolve.' " (*Id.* at p. 341, quoting *Stone v. Superior Court* (1982) 31 Cal.3d 503, 509, fn. 1.)

DePape's motion required the court to decide whether the state charges necessitated proof of physical acts beyond those necessary for the federal conviction, and whether physical acts used to prove nonact elements of an offense are acts "in respect to which [the defendant] is on trial." (§ 656.) The parties agree that these are questions of law. The People seem to assume that because the trial court deferred ruling on the motion to dismiss, it must

have weighed the prosecution's evidence in making its decision.[27] We do not agree.

As earlier described, the trial court expressed two reasons for deferring ruling on the motion. One was that the court wanted to better understand what acts it needed to focus on for the section 656 analysis. The discussion at the hearing reflected the court's efforts to understand the parties' arguments on this question, such as the People's position that the relevant physical acts included those used to prove premeditation. The other reason was that the court saw deferring decision on the motion as "curing" the People's objection to the late filing of the motion by giving the People the opportunity to "present evidence that might, and I emphasize might, vindicate their opposition to the motion to dismiss." The court's remarks indicate it expected the People's evidence and defense cross-examination to provide it with "concrete information" about the acts necessary for the federal action and the present charges, not that it believed there were factual issues it needed to weigh and resolve. Indeed, the parties did not dispute DePape's physical conduct; they disputed the legal significance of that conduct for purposes of section 656.

---

[27] The People again point to the trial court's comment that "it's not 100 percent clear what the federal evidence was about what happened to Mr. Pelosi" as showing the court "acknowledged DePape's evidentiary deficiency." We do not read the remark this way. As earlier noted, the court and counsel had been discussing the People's argument that the attempted murder charge would require proof of multiple blows. In noting it did not know exactly what the evidence in federal court was, the court was simply saying this did not matter because the court was not persuaded it had to "separate the first blow to Mr. Pelosi from the second blow." In other words, the court was explaining a legal conclusion, not recognizing an evidentiary deficiency.

The procedure employed by the court created some ambiguity, particularly as the court referred to the evidence the prosecution had presented in explaining its ruling. Specifically, addressing the People's argument that the attempted murder count involved proof of multiple hammer strikes while the federal assault required only one, the court commented that although the evidence showed two blows, they were within fractions of a second and therefore essentially a single physical act.[28] If these remarks indicate the court weighed the evidence, concluded the hammer blows constituted one physical act (i.e., the same physical act constituting the federal assault) and resolved the double jeopardy issue on that basis, we would have to conclude it did not engage in the proper analysis. The question whether the federal and state prosecutions were founded on DePape's commission of the same physical act turns on what physical conduct was *required* to prove each offense, not what conduct was *in fact* proven. The People stop short of asserting the court *did* resolve disputed factual issues, however, and we agree that *to the extent* it granted the motion to dismiss based on a factual finding that the People failed to prove more than one blow, its reasoning was incorrect.

We do not understand the court to have erred in this way. Read in conjunction with the discussions that led the court to defer deciding the motion, we see the court's remarks as expressing its rejection of the distinction the People advanced between the physical act underlying the federal conviction and the acts necessary for the charged attempted murder.

---

[28] The court commented that "the blows were on the evidence presented in rapid succession"; "we have evidence of two blows and yet it had to have been done within fractions of a second"; and "the evidence is same time, same place, same weapon, same men, fraction of a second, the same act."

In any event, the court answered the legal questions posed by the motion correctly. The dismissed counts did not require proof of physical conduct beyond the conduct DePape was convicted of committing in the federal case, and additional nonact elements of the state offenses did not render section 656 inapplicable. The court's decision did not depend on resolution of any factual issue that was required to be submitted to a jury. Accordingly, any error in the court's reasoning was harmless. The attempted murder, elder abuse and assault with a deadly weapon counts were properly dismissed.

## DISPOSITION

The order dismissing counts 1, 3 and 4 is affirmed.

STEWART, P.J.


I concur.

MILLER, J.


*People v. DePape* (A170759)

47

*People v. DePape* (A170759)

Concurring and Dissenting Opinion of Desautels, J.

I agree with a number of points articulated by the majority. Procedurally, I concur that Penal Code[1] section 1238, subdivision (a)(8) grants the People the authority to bring this appeal and that "DePape waived jeopardy by filing a motion to dismiss on the eve of trial." (Maj. opn., *ante*, at p. 10.) I also agree that "the question of former jeopardy is one of law for the courts to decide." (Maj. opn., *ante*, at p. 17.) On the merits, I concur with the majority's determination that, under section 656, the California charge of assault with a deadly weapon in violation of section 245, subdivision (a)(1) was barred by the federal prosecution of DePape for " 'willfully and unlawfully assault[ing] Paul Pelosi' " " '*by means of hitting a hammer on Mr. Pelosi's head . . . .*' " (Maj. opn., *ante*, at pp. 21–22.)

But I respectfully disagree with the majority's conclusion that section 656 bars prosecution of the charges for attempted premeditated murder (§§ 664/187; count 1) and elder abuse (§ 368, subd. (b)(1); count 3). With all due respect to my colleagues, I believe the method of analysis used by the majority inappropriately focuses on the conduct upon which the charges are based—which mirrors the trial court's improper reliance on the evidence presented at trial—as compared to the "physical elements" of the charged offenses as the law requires. (*People v. Lazarevich* (2001) 95 Cal.App.4th 416, 421 ["To determine whether a defendant has been placed once in jeopardy in another jurisdiction, the trial court must look at the physical elements of each crime"].)

Instead, conducting a de novo review considering the different elements required to be proven for the charged offenses, which, per *People v. Homick*

---

[1] Further unspecified statutory references are to the Penal Code.

1

(2012) 55 Cal.4th 816, 840 (*Homick*), is the correct inquiry, I would find that jeopardy does not bar the charges of attempted premeditated murder in the first degree (§§ 664/187; count 1) or elder abuse (§ 368, subd. (b)(1); count 3). Therefore, I would affirm the dismissal of the assault with a deadly weapon charge (§ 245, subd. (a)(1); count 4) but reverse the dismissal of the charges for attempted premediated murder and elder abuse (counts 1 & 3), which are eligible to be retried. For these reasons, I respectfully dissent.

## LEGAL BACKGROUND

As stated, although "prosecution and conviction for the same act by both state and federal governments are not barred by the Fifth Amendment guarantee against double jeopardy," states are not precluded from "providing greater double jeopardy protection than is provided by the federal Constitution." (*People v. Comingore* (1977) 20 Cal.3d 142, 145 (*Comingore*).) As relevant to this appeal, section 656 offers that greater protection by providing a defense to state charges whenever a defendant has been acquitted in "a criminal prosecution under the laws of the United States . . . based upon the act or omission in respect to which he or she is on trial." (*People v. Gonzalez* (2015) 241 Cal.App.4th 1103, 1112 ["In California, sections 656 and 793 provide double jeopardy protection beyond the protection afforded by the federal Constitution"]; § 656.)

In conducting a double jeopardy analysis under section 656, one considers if "[a]ll the acts constituting the state offense were included in the federal offense and were necessary to constitute the federal offense." (*People v. Candelaria* (1956) 139 Cal.App.2d 432, 440 (*Candelaria I*).) A subsequent prosecution in California "is not barred where the offense committed is not the same act but involves *an element* not present in the prior prosecution."

2

(*People v. Belcher* (1974) 11 Cal.3d 91, 99 (*Belcher*), italics added, citing *People v. Candelaria* (1957) 153 Cal.App.2d 879, 884 (*Candelaria II*).)

Moreover, " 'In every crime or public offense there must exist a union, or joint operation of act and intent, or criminal negligence.' Intent, then, is an element of a crime or a public offense, not of an act." (*Comingore, supra*, 20 Cal.3d at p. 148,[2] quoting § 20.) As a result, double jeopardy has precluded subsequent prosecution where vehicle theft charges in Oregon and California were "based upon the same *physical conduct*" even though the California charge required an "intent to deprive" not required under the Oregon statute. (*Comingore*, at p. 146.) But in determining if jeopardy attaches, "[a] prior prosecution is not 'founded' or 'based,' within the meaning of section 656, on every piece of conduct shown by the evidence at the earlier trial. Were that the rule, the entire course of criminal conduct that led to the earlier charges would be effectively protected from prosecution in California . . . ." (*Homick, supra*, 55 Cal.4th at p. 844.) Instead, as explained by our Supreme Court, "section 656 applies when the *physical conduct* required for the California charges has previously been the subject of an acquittal or conviction in another jurisdiction, regardless of whether the two charges have different requirements as to intent or other nonact elements." (*Homick*, at p. 840.) "The application of section 656 thus turns on whether the California charges against defendant required proof of conduct that was not required for conviction of the earlier federal charges." (*Id.* at p. 843.)

---

[2] *Comingore* was decided under section 793 rather than 656, but because " 'there appears to be no legal significance in the different wording of section 656 and section 793,' " the Supreme Court was not "able to discover, any reason to believe that one of the statutes was intended to provide greater protection than the other two." (*Comingore, supra*, 20 Cal.3d at pp. 147–149.)

3

**DISCUSSION**

Deciding the application of section 656 in the instant case requires a comparison of the elements of the assault charge proven in DePape's federal action to the elements required to be proven in the contested counts in the California action. As the majority articulated, federal assault does not require proof that the defendant made physical contact with the victim. (See 18 U.S.C. § 115(a)(1)(A).) However, the federal indictment alleged in relevant part that DePape " 'willfully and unlawfully assaulted Paul Pelosi, the spouse and member of the immediate family of Nancy Pelosi, a United States official . . . *by means of hitting a hammer on Mr. Pelosi's head*, with intent to impede, intimidate, interfere with and retaliate against Nancy Pelosi while she was . . . engaged in and on account of the performance of her official duties.' " (Maj. opn., *ante*, at pp. 21–22.) The jury was relatedly instructed, the government was required to prove beyond a reasonable doubt that DePape " 'forcibly assaulted a member of the immediate family of a United States official,' and that '[t]here is a forcible assault when one person intentionally strikes another.' " (Maj. opn., *ante*, at p. 22.) Thus, as discussed below, the specific language of the indictment and jury instructions here imposed an added proof requirement beyond that of a statutory federal assault that we consider in our analysis of each contested count.

### *Assault*

In California, a conviction for assault in violation of section 245, subdivision (a)(1) requires proof that: (1) the defendant did an act with a deadly weapon other than a firearm that by its nature would directly and probably result in the application of force to a person; (2) the defendant did that act willfully; (3) when the defendant acted, he was aware of facts that would lead a reasonable person to realize that his act by its nature would

4

directly and probably result in the application of force to someone; and (4) when the defendant acted, he had the present ability to apply force likely to produce great bodily injury with a deadly weapon other than a firearm to a person. (*People v. Golde* (2008) 163 Cal.App.4th 101, 122 [approving CALCRIM No. 875]; see also *Golde*, at p. 108 [" 'assault only requires an intentional act and actual knowledge of those facts sufficient to establish that the act by its nature will probably and directly result in the application of physical force against another' "].)

Although neither the federal nor state definitions of assault necessarily require physical contact, I agree with the majority that, in this instance, section 656 precludes the state prosecution for assault with a deadly weapon. I reach this conclusion not because, as the majority states, "the federal conviction was based on DePape striking Pelosi's head with a hammer," but because the elements—not the conduct or the evidence introduced at trial— necessary to prove the assault in both the federal and state actions overlap (i.e., a threat coupled with present ability). (See *Homick*, *supra*, 55 Cal.4th at pp. 844–845 ["A prior prosecution is not 'founded' or 'based,' within the meaning of section 656, on every piece of conduct shown by the evidence at the earlier trial"].)

### *Attempted Premeditated Murder – The Elements*

Using this same elements-based analysis, I would conclude the elements necessary to prove that the attempted murder was "willful, deliberate, and premeditated" as charged in count 1 of the state court action differ from those required to prove the federal assault for which DePape was convicted; therefore, section 656 does not preclude prosecution in California.

Under California law, attempted murder requires proof beyond a reasonable doubt of both of the following elements: (1) the defendant took at

least one direct but ineffective step toward killing another person; and (2) the defendant intended to kill that person. (CALCRIM No. 600; *People v. Lawrence* (2009) 177 Cal.App.4th 547, 556–557 [CALCRIM No. 600 correctly states the law of attempted murder].) "A *direct step* requires more than merely planning or preparing to commit murder or obtaining or arranging for something needed to commit murder. A direct step is one that goes beyond planning or preparation and shows that a person is putting his or her plan into action. A direct step indicates a definite and unambiguous intent to kill. It is a direct movement toward the commission of the crime after preparations are made. It is an immediate step that puts the plan in motion so that the plan would have been completed if some circumstance outside the plan had not interrupted the attempt." (CALCRIM No. 600.) A person can be guilty of attempted murder even if, after taking that "direct step," he abandons further efforts or the attempt is interrupted by something beyond his control, just as one can also be guilty of attempted murder if the murder was actually completed. (*Ibid.*; *People v. Juarez* (2016) 62 Cal.4th 1164, 1170 ["Attempted murder requires the intent to kill and a direct but ineffectual act toward accomplishing the intended killing"].)

In order to elevate the crime of attempted murder to attempted murder in the first degree, as was separately alleged in this state court action, one must also prove a third element: that the attempted murder was "willful, deliberate, and premeditated." (§ 189, subd. (a); see also CALCRIM No. 601.) A defendant acts willfully "if he intended to kill when he acted." (CALCRIM No. 601; *People v. Gonzalez* (2012) 54 Cal.4th 643, 661 [CALCRIM No. 601 "is a correct statement of the mental state requirements for an *attempted* murder committed by a defendant"].) A defendant has deliberated "if he carefully weighed the considerations for and against his choice and, knowing

6

the consequences, decided to kill." (CALCRIM No. 601; *People v. Pearson* (2013) 56 Cal.4th 393, 443–444 [" '[t]he word "deliberate," which relates to how a person thinks, means formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action' "].) A defendant acts with premeditation "if he decided to kill before completing the act[s] of attempted murder." (CALCRIM No. 601; *Pearson*, at p. 443 [" ' " [P]remeditation' means thought over in advance" ' "].)

These elements necessary to prove the charged attempted murder and that it was "willful, deliberate, and premeditated" simply do not match the elements of assault alleged in the federal matter. First, the federal assault did not require proof that DePape's hammer swing was "one direct but ineffective step toward killing another person." Second, the federal assault did not require proof that in acting, DePape intended to kill Paul Pelosi (Pelosi). And third, the federal assault did not require proof that the hitting with a hammer was willful, deliberate, or premeditated. If a court finds any of these "elements" of attempted premeditated murder requires proof of "acts" not necessary to prove the federal assault charged—which the majority acknowledges does not require physical contact (see 18 U.S.C. § 115(a)(1)(A))—then jeopardy does not attach, and the first degree attempted murder charged in state court can proceed. (See., e.g., *Belcher*, *supra*, 11 Cal.3d at p. 99; *Homick*, *supra*, 55 Cal.4th at p. 842.)

The majority overlooks these elemental differences and instead focuses on the conduct necessary to prove the federal conviction: "The charged attempted murder in the present case was clearly *based on* DePape striking Pelosi in the head with a hammer, as this was the physical act the People alleged constituted the 'direct but ineffectual step toward killing' required for

7

that offense." (Maj. opn., *ante*, at p. 27, italics added.) Because the assault charged in the federal case and the attempted murder charged in the present case each required proof that DePape struck Pelosi's head with a hammer at least once, the majority decides DePape cannot be prosecuted for attempted murder in California. This analysis is notably similar to the trial court's improper focus on the evidence at trial[3] and results in an expansive conclusion would inappropriately preclude the prosecution of essentially all crimes of violence in California that are "based on" the same assaultive conduct (like hitting with a hammer) as a crime in another jurisdiction.[4]

_____

[3] The majority acknowledges the procedure employed by the trial court did create "some ambiguity" and might arguably be taken to indicate the court improperly weighed the evidence. But the trial court's conduct was not ambiguous; it declined to rule on the section 656 motion at the start of the trial, stating, "I want a concrete record before I make those decisions." Then, in ruling on the section 656 motion after the conclusion of the People's case-in-chief, the court explicitly relied on the evidence introduced at trial: "As I see it, as I've said several times this morning, this is all one event. The same two men, the same location, the same day, the same weapon, and the blows were *on the evidence presented* in rapid succession within fractions of a second of each other most likely." (Italics added.) After this "sober look at the evidence" and concluding, "I do consider the two blows essentially to be one continuous act," the court dismissed counts 1, 3, and 4 and their associated allegations. This evidence-based method of analysis, as the majority accepts, is improper.

[4] The majority's discussion of the potential significance of one versus two hammer blows further illustrates how their "conduct-based" analysis slips into a consideration of the evidence introduced at trial. The record reveals the People discussed the number of hammer blows after the trial court decided to defer ruling on the motion to dismiss until the close of the People's case-in-chief because, "Acts are established by evidence"; thus, the court explained, "the better course here is for me to get some concrete evidence with testimony and other evidence." To counter this analysis, the People attempted to argue both at trial and on appeal that if only one hammer blow was necessary to prove federal assault, the second "unnecessary" hammer blow could be considered a separate act "necessary" to

8

Such a holding is inconsistent with the case law before us. (E.g., *People v. Davis* (2011) 202 Cal.App.4th 429, 438 [assessing double jeopardy "requires the court to compare and construe *the applicable criminal statutes* from both jurisdictions" (italics added)]; *Homick, supra,* 55 Cal.4th at p. 842 [no jeopardy where the new offense " 'involves an element not present in the prior prosecution' "].)

The cases of *Candelaria I* and *II* demonstrate the appropriate elements-based application of section 656 where the crimes charged in California were "based on" the same criminal conduct as the crimes charged in federal court. On December 10, 1954, the defendant pointed a gun at a teller in the federally insured Citizens National Bank in Los Angeles and told her to give him some money; she gave him $950 that belonged to the bank. (*Candelaria I, supra,* 139 Cal.App.2d at p. 433; *Candelaria II, supra,* 153 Cal.App.2d at pp. 881–882.) In January 1955, the defendant pled guilty in federal court to the charge of robbery based on the taking of money from the teller "by force and violence and by intimidation." (*Candelaria I,* at p. 434.) The defendant was subsequently charged with and convicted of robbery in state court based on the same conduct. (*Ibid.*) The Court of Appeal reversed

_____

prove first degree premeditated murder and preclude the attachment of jeopardy.

But if one conducts the required elements-based analysis, the number of hammer blows shown in either trial is irrelevant to the application of section 656 because the proper focus is instead on whether the federal assault conviction required proof of a direct but ineffective step toward killing with the intent to kill, which was not necessary to prove the federal assault. (See *Homick, supra,* 55 Cal.4th at pp. 843–844 ["The application of section 656 thus turns on whether the California charges against defendant required proof of conduct that was not required for conviction of the earlier federal charges"; it does not depend on "the evidence at the earlier trial"]; §§ 664/187.)

the conviction holding that "[t]he only additional element involved in the federal prosecution was that the money belonged to a national bank whose deposits were federally insured," which "pertained to the matter of jurisdiction of the federal court, and it did not pertain to any activity on the part of defendant in committing the robbery." (*Id*. at p. 440.) Using an elements-based approach, *Candelaria I* concluded, "All the acts constituting the state offense were included in the federal offense and were necessary to constitute the federal offense." (*Ibid*.) Therefore, "It is clear that, within the meaning of said section 656, the federal conviction was 'founded upon the act' in respect to which the defendant was tried in the present case. It appears, as a matter of law, that the previous federal conviction is a sufficient defense in the present case." (*Ibid*.)

After the reversal in *Candelaria I*, the district attorney filed a new felony information in state court, this time alleging burglary, rather than robbery, based on the same December 10, 1954 conduct when the defendant "enter[ed] the Citizens National Trust and Savings Bank of Los Angeles, Lincoln Heights Branch, with the intent to commit a theft, and that he was armed with a deadly weapon (a revolver) at the time." (*Candelaria II*, *supra*, 153 Cal.App.2d at p. 880.) At the ensuing court trial, the defendant moved for a judgment of not guilty because he had been once in jeopardy for the federal robbery conviction discussed in *Candelaria I*. (*Candelaria II*, at p. 881.) The trial court denied the motion and found the defendant guilty of burglary in the first degree. (*Id*. at pp. 880–881.) The defendant appealed, and, despite the fact that "both crimes arose from the same series of acts," the *Candelaria II* court determined that because of the different elements required to prove robbery and burglary, section 656 did not provide the defendant "any assistance." (*Id*. at p. 884.) "[R]obbery and burglary may

10

both be committed in the same transaction and a culprit may be prosecuted for both." (*Ibid*.) And "double jeopardy will not lie unless all of the elements of the one crime are included in the other." (*Ibid*., citing *People v. Herbert* (1936) 6 Cal.2d 541, 545; *Rodriguez v. Superior Court* (1946) 27 Cal.2d 500, 501–502.)

*Candelaria II* explained: Despite the fact the crimes were "based on" the same conduct, "where the two offenses are entirely separate and distinct and the one is not necessarily included in the other, a prosecution for the one is no bar to a prosecution for the other even though the same testimony may be applicable to both." (*Candelaria II*, *supra*, 153 Cal.App.2d at p. 885.) Because the burglary was "not the same act complained of in the federal court," *Candelaria II* concluded that section 656 did not apply and jeopardy did not attach. (*Candelaria II*, at pp. 884–886.)

*Belcher* reached a similar conclusion in connection with the assault and robbery of a federal agent when viewed through an ineffective assistance of counsel claim. (*Belcher*, *supra*, 11 Cal.3d at pp. 100–101.) Belcher was charged in state court with the robbery and assault with a deadly weapon of a federal agent and a local law enforcement officer after having been previously acquitted in a federal action for the assault of the federal agent based on the same conduct. (*Id*. at pp. 94–95.) In determining if Belcher's attorney's failure to raise jeopardy as a defense was ineffective assistance, our Supreme Court conducted an analysis under section 656. (*Belcher*, at p. 98.) Relying on *Candelaria I* and *Candelaria II*, the Supreme Court held that "Since defendant was acquitted of assault upon [the federal agent] in the federal court, he cannot be convicted for the same assault upon the same person in the subsequent state prosecution." (*Belcher*, at p. 99.) The fact that the victim's status as a federal agent was required to have been proven in the

11

federal action did not avoid the attachment of jeopardy because "proof of the status of the victim" was necessary only "for jurisdictional purposes." (*Id*. at p. 100.)

However, when the *Belcher* court applied the same analysis to the state court robbery convictions, it reached "a different result." (*Belcher*, *supra*, 11 Cal.3d at p. 100.) Even though the robbery convictions were based on the same conduct as the assault, jeopardy did not attach because "A conviction for each of these offenses requires at the very least proof of an important additional act by defendant—the 'taking of personal property in the possession of another' (§ 211)—that need not be proved to establish the federal offense of assault with a deadly weapon upon a federal officer." (*Id*. at p. 100.) The robbery convictions were affirmed. (*Id*. at pp. 100–101.)

So, too, here, the elements required to prove an attempted murder differ from the elements required to prove the federal allegation of assault with a deadly weapon even though the charges are based on the same conduct. The concurrent prosecution of assault with a deadly weapon and attempted murder in a single information in state court is unquestionably permitted. (See, e.g., *People v. Parks* (1971) 4 Cal.3d 955, 961–962 [affirming convictions for attempted murder and assault with a deadly weapon based on "the same act"].) Any overlap in conduct is addressed through the application of section 654[5] to ensure a defendant is not punished multiple times for the same conduct or tried multiple times for offenses arising out of the same course of conduct. The attachment of jeopardy under section 656 is intended

---

[5] "An act or omission that is punishable in different ways by different provisions of law may be punished under either of such provisions, but in no case shall the act or omission be punished under more than one provision. An acquittal or conviction and sentence under any one bars a prosecution for the same act or omission under any other." (§ 654, subd. (a).)

12

to be narrower than the prohibitions under section 654.  (See, e.g., *Homick*, *supra*, 55 Cal.4th at pp. 844–845 ["A prior prosecution is not 'founded' or 'based,' within the meaning of section 656, on every piece of conduct shown by the evidence at the earlier trial.  Were that the rule, the entire course of criminal conduct that led to the earlier charges would be effectively protected from prosecution in California, an interpretation we expressly rejected for section 656 (in contrast to § 654) in *Belcher*, *supra*, 11 Cal.3d at page 98"]; *Belcher*, at p. 98 ["There exists good reason for declining to apply section 654 to successive federal and state prosecutions"].)

As such, an expansive reading of section 656 that uses a federal assault conviction to preclude prosecution for the different offense of attempted murder in state court just because both charges may be based on the same conduct, i.e., DePape's alleged striking Pelosi on the head with a hammer, is inconsistent with our Supreme Court precedent.  (*Homick*, *supra*, 55 Cal.4th at p. 844; see also *Candelaria II*, *supra*, 153 Cal.App.2d at p. 885.)  Because a "direct but ineffective step toward killing" was not necessary to be proven to secure the assault conviction in the federal action, the state court attempted murder charge should be permitted to proceed to trial.

### ***Attempted Premeditated Murder – Mental State***

As stated, if a state charge requires proof of one single element that differs from the federal charge, jeopardy does not attach.  (See, e.g., *Candelaria II*, *supra*, 153 Cal.App.2d at pp. 883–885; *People v. Bellacosa* (2007) 147 Cal.App.4th 868, 873–878 (*Bellacosa*).)  Because the federal assault conviction did not require proof of a "direct but ineffective step toward killing," one need not compare the remaining elements.  (See *Belcher*, *supra*, 11 Cal.3d at p. 99 ["a conviction in this state is not barred where the offense committed . . . involves an element not present in the prior prosecution"];

*Homick*, *supra*, 55 Cal.4th at p. 843 [concluding section 656 did not bar prosecution because "at least" the special allegation of murder by lying in wait required proof of conduct absent from the federal charge].)  That said, I must continue the discussion because I disagree with the majority's determination that "willfulness, premeditation and deliberation" are " 'nonact' elements that do not defeat the application of section 656."  (Maj. opn., *ante*, at p. 29, quoting *Homick*, at p. 840.)

To start, the majority does not specifically address the second element required to prove attempted murder, i.e., the "intent to kill," but instead focuses on the allegation that the attempted murder charged here was willful, deliberate, and premeditated.  (See §§ 664/187 and CALCRIM No. 601.)  This omission is significant as these different elements each must be separately proven:  "It is well established that the brutality of a killing cannot in itself support a finding that the killer acted with premeditation and deliberation" even though "the manner of the killings" can suggest premeditation.  (*People v Anderson* (1968) 70 Cal.2d 15, 24; *People v. Thomas* (1992) 2 Cal.4th 489, 518.)

In focusing on the premeditation allegation, the majority rejects the People's argument that additional "physical act evidence" is required to prove an attempted murder is willful, deliberate, and premeditated.  (See *People v. Anderson*, *supra*, 70 Cal.2d at pp. 26–27 [describing "type of evidence . . . sufficient to sustain a finding of premeditation and deliberation"].)  The majority characterizes such evidence as not "necessarily acts 'in respect to which [the defendant] is on trial' " and states, "The fact that premeditation may be proven with evidence of physical conduct does not distinguish it from other mental states."  (Maj. opn., *ante*, at pp. 31, 34.)  The majority concludes that, "Because the dispositive consideration for application of section 656 is

14

physical conduct, not 'intent or other nonact elements' (*Homick*, [*supra*, 55 Cal.4th] at p. 843), the premeditation necessary to turn an assault into an attempted premeditated murder does not determine whether the two prosecutions are 'based upon' the same act within the meaning of section 656." (Maj. opn., *ante*, at p. 35.)

An examination of the earlier case of *Comingore* and criminal mental states requires me to disagree with this reading of *Homick*. *Comingore* involved the theft of a car in California that was driven into Oregon where the defendant was arrested and convicted of the unauthorized use of a vehicle. (*Comingore, supra*, 20 Cal.3d at p. 144, citing Or. Rev. Stat. Ann. § 164.135.) The defendant was later prosecuted for vehicle theft in California but challenged this subsequent action as precluded by section 656. In response, the People "conceded" that the California charges were "based upon the same *physical conduct*" as the Oregon offense but argued jeopardy did not preclude the California prosecution because Vehicle Code section 10851 required "the intent to deprive the owner of his vehicle temporarily [citation] or permanently," which was assertedly not required for the Oregon conviction.[6] (*Comingore*, at pp. 146–147.)

The Supreme Court considered the People's argument to "founder[ ] upon the language of section 20," which provides, " 'In every crime or public offense there must exist a union, or joint operation of act and intent, or criminal negligence.' " (*Comingore, supra*, 20 Cal.3d at pp. 147, 148.) The

---

[6] Notably, *Comingore* does not discuss the intent associated with Oregon Revised Statutes Annotated section 164.135, which appears to require that a person "knowingly" take a vehicle belonging to another when "[t]he person is aware of and consciously disregards a substantial and unjustifiable risk that the owner of the vehicle . . . does not consent to the taking . . . ." (Or. Rev. Stat. Ann. § 164.135, subd. (1)(a)(B).)

Supreme Court then summarily concluded, "Intent, then, is an element of a crime or a public offense, not of an act." (*Id*. at p. 148.) This statement is consistent with California's criminal jury instructions, which explain that to be criminally responsible, a person "must not only intentionally commit the prohibited act but must do so with a specific mental state." (CALCRIM No. 252 [Union of Act and Intent]; see also CALCRIM Nos. 253 [Criminal Negligence] and 254 [Strict Liability].) Both the unauthorized taking of a vehicle in Oregon and vehicle theft in California require this same union of act and a code-specific criminal mental state, thus it is unsurprising that the court declined to parse between the potential distinctions in the type of intent needed in the different jurisdictions for the same substantive offense. (*Comingore*, at pp. 148–149.)

But that is not the case here. Again, the first part of an elements-based section 656 analysis distinguishes attempted murder in California from federal assault because the attempted murder requires a "direct but ineffective step toward killing." (CALCRIM No. 600) But even assuming no distinction, the second element required to prove attempted murder, i.e., the "intent to kill," is a type of specific intent different from the "intentional[ ] strik[ing of] another" required to prove the federal assault and is meaningfully different from the general criminal intent discussed in the vehicle theft context in *Comingore*. (See *People v. Mumin* (2023) 15 Cal.5th 176, 190 ["*attempted* murder requires a specific intent to kill"].) In fact, our Supreme Court has found it to be reversible error when a trial court "neglected . . . to inform the jury that the crime of attempted murder requires a specific intent to kill, a mental state coincident with express malice but not necessarily with implied malice or felony murder." (*People v. Guerra* (1985) 40 Cal.3d 377, 386.) If our Supreme Court determined that the intent to kill

16

is such a specific and heightened element of attempted murder that failure to relatedly and appropriately instruct on its distinction from other criminal mental states is reversible error, it cannot have intended in *Comingore* to blanketly preclude all mental states from consideration in a section 656 analysis. (See, e.g., *Guerra*, at p. 386.)

Indeed, other courts have not interpreted *Comingore* so broadly as the majority. For example, in *Bellacosa, supra,* 147 Cal.App.4th at pages 877–878, the Court of Appeal limited the scope of *Comingore*'s holding based on "the prosecution's concession" in *Comingore* that the elements of the California and Nevada crimes were the same. In the context of charges related to driving under the influence and police evasion in California and Nevada, the Court of Appeal ultimately concluded that the California element of driving "with willful and wanton disregard for the safety of persons and property," which can be shown through proof of physical acts, was sufficient to distinguish the California prosecution for "eluding a peace officer as a felony" from Nevada's "attempting to elude a peace officer as a misdemeanor" and precluded the attachment of jeopardy. (*Bellacosa*, at p. 878.) So, too, here, the fact that a conviction for attempted murder in California requires proof of the additional element of a specific intent to kill that can be shown with physical acts and is not an element required to prove federal assault means section 656 does not preclude its prosecution in this case.

### *Attempted Premeditated Murder – In the First Degree*

The third distinguishing element alleged here and necessary to prove attempted murder *in the first degree* is willfulness, deliberation, and premeditation. (CALCRIM No. 601) This third element is a different and separate requirement *on top of* the previously discussed intent to kill element

17

that is built into any attempted murder charge.  (See §§ 664/189; CALCRIM Nos. 600 & 601.)  Thus, even if one considers the "direct but ineffective step" and "intent to kill" elements insufficiently different from the federal assault charge to preclude the attachment of jeopardy in this case, one must also consider the additional allegation that the attempted murder was "willful, deliberate, and premeditated."  Because the majority relies on *Homick* in reaching their holding with regard to premeditation, so do I in reaching a different conclusion.

*Homick* arose out of state court convictions for conspiracy to commit murder and first degree murder by means of lying in wait that were based on the same conduct as a prior federal conviction for murder for hire.  (*Homick*, *supra*, 55 Cal.4th at pp. 826, 839.)  In considering claims of double jeopardy under section 656, the Supreme Court summarized, "we have held section 656 applies when the *physical conduct* required for the California charges has previously been the subject of an acquittal or conviction in another jurisdiction, regardless of whether the two charges have different requirements as to intent or other nonact elements."  (*Homick*, at p. 840, citing *Comingore*, *supra*, 20 Cal.3d at pp. 146–148; *Belcher*, *supra*, 11 Cal.3d at pp. 99–100.)  Thus, "a California conviction *is barred* if all the acts necessary to the California charges were also necessary to prove the prior charges, but is *not barred* 'where the offense committed is not the same act but involves an element not present in the prior prosecution' "; the word " 'element' in this formulation refers only to *conduct* required to prove the charges, not to criminal intent or other nonact elements."  (*Homick*, at p. 842, quoting *Belcher*, at p. 99 and *Comingore*, at pp. 146–148.)

The Supreme Court then concluded that the offense of murder by lying in wait was not precluded by section 656 because it "required proof of conduct

18

that was not required for conviction of the earlier federal charges [i.e., murder for hire]." (*Homick*, *supra*, 55 Cal.4th at pp. 843, 846 ["California's prosecution of defendant for murder *by means of lying in wait* was not unfair to him, as he had not previously been prosecuted for that conduct, nor did it impugn the finality of a prior judgment, as the federal court verdict did not adjudicate the lying-in-wait issue"].)  Notably, the Supreme Court stated that the fact the same conduct was used to prove the murders in both federal and state court was "of no import, as proof of an ambush was not '*necessary* to prove the offense in the prior [federal] prosecution.' " (*Id*. at pp. 844–845, quoting *Belcher*, *supra*, 11 Cal.3d at p. 99.)  So, too, here, that both the federal and state prosecutions may have shown DePape hit Pelosi two times in the head with a hammer was not "necessary" to prove the federal assault, which statutorily did not require physical contact and satisfied the language of the federal indictment with proof of a single blow.  (See 18 U.S.C. § 115(a)(1)(A).)

Disapproving of the type of conduct-based section 656 analysis the majority engages in here, *Homick* explained, "A prior prosecution is not 'founded' or 'based,' within the meaning of section 656, on every piece of conduct shown by the evidence at the earlier trial.  Were that the rule, the entire course of criminal conduct that led to the earlier charges would be effectively protected from prosecution in California, an interpretation we expressly rejected . . . in *Belcher*, *supra*, 11 Cal.3d at page 98."[7]  (*Homick*, *supra*, 55 Cal.4th at pp. 844–845.)

_____

[7] As noted above, *Homick* also affirmed *Belcher*'s holding that section 656 does not extend as "far" as section 654.  (*Homick*, *supra*, 55 Cal.4th at pp. 841, 845, citing *Belcher*, *supra*, 11 Cal.3d at pp. 97–98 ["noting that Belcher's Cal[ifornia] robbery convictions, which we held were not barred under § 656 by his prior federal conviction for assault on a federal officer,

19

Turning to the different types of mental states required to be proven to enhance murder and attempted murder convictions, the *Homick* court also distinguished allegations such as lying in wait from the type of general criminal mental states considered in *Comingore*: "That the allegation of murder by means of lying in wait was contained in a special circumstance allegation attached to the murder charge, rather than in a separate count charging an offense, does not mandate the application of section 656" because factual sentencing allegations have, "for constitutional purposes including double jeopardy, been viewed as functionally equivalent to elements of a greater offense." (*Homick*, *supra*, 55 Cal.4th at p. 845.) Thus, lying in wait can be "conceptualized" as a greater offense. (*Ibid*.)

Similarly, the special allegation at issue here, that the charged attempted murder be "willful, deliberate, and premeditated," must be additionally proven to elevate an attempted murder charge to attempted murder in the first degree. (*People v. Dominguez* (1992) 4 Cal.App.4th 516, 521, fn. omitted ["such punishment cannot be imposed unless the fact the attempted murder was willful, deliberate and premeditated is charged in the accusatory pleading and admitted or found to be true by the trier of fact"].) It therefore deserves the same element-based consideration as a lying-in-wait allegation, as both require separate and different proof from the general

---

would likely have been barred under a § 654 course-of-conduct analysis had the two prosecutions been brought sequentially in Cal[ifornia] courts"].)

An adoption of the majority's conduct-based analysis and expansion of *Comingore* to disallow consideration of premeditation and deliberation in a section 656 analysis would in fact extend section 656 much farther than section 654, which permits the prosecution and sentencing of both assault with a deadly weapon and attempted murder. (See, e.g., *People v. Midell* (2025) 113 Cal.App.5th 1060, 1083–1085 [§ 654 did not prohibit consecutive sentences on attempted murder and torture convictions].)

20

criminal mental state necessary to prove a federal assault, and therefore precludes the attachment of jeopardy. (*Homick, supra,* 55 Cal.4th at p. 845.) Like "lying-in-wait," the "willful, deliberate, and premeditated" allegation is the functional equivalent of a greater offense that requires proof of something more than the "intent to kill" included within the offense of attempted murder (and far more than the general federal criminal intent alleged that DePape "willfully and unlawfully assaulted" Pelosi in the commission of the federal assault). (See, e.g., *People v. Ramos* (2011) 193 Cal.App.4th 43, 48 ["Evidence of intent to kill is usually inferred from defendant's acts and the circumstances of the crime"]; citing *People v. Smith* (2005) 37 Cal.4th 733, 741 ["it is well settled that intent to kill or express malice, the mental state required to convict a defendant of attempted murder, may in many cases be inferred from the defendant's acts and the circumstances of the crime"].)

To read *Comingore* as precluding consideration of enhancing mental states like premeditation and deliberation in a section 656 analysis would be inconsistent with *Homick*'s admonition that "Where California charges the defendant with conduct that makes him or her eligible for the state's most severe punishments, death and life in prison without the possibility of parole, and that particular conduct has not been the subject of a prior federal or sister-state prosecution, the state's interest in a separate prosecution is particularly strong, while the protective purposes of section 656 are not implicated." (*Homick, supra,* 55 Cal.4th at p. 846.)[8]  Just as the lying-in-wait

---

[8] The legislative history accompanying the 2004 amendment of section 656 further suggests the Legislature intended to permit consideration of elevated, enhancing mental states as part of a section 656 analysis. The prior version of section 656 provided, "a fugitive who flees to a foreign country after committing a serious crime cannot be prosecuted in California if that person successfully fights extradition and then is prosecuted in the other country." (Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Assem.

special circumstance alleged in *Homick* elevated the potential punishment to life imprisonment or death, here, the separate allegation of willfulness, premeditation, and deliberation elevates the attempted murder allegation to attempted murder in the first degree with an accompanying potential life sentence. (§§ 664/187; *People v. Ramos, supra,* 193 Cal.App.4th at p. 47 ["the crime of attempted murder is not divided into degrees and a finding of willful, deliberate, and premediated attempted murder is necessary only for purposes of sentence enhancement"].) Recognizing the additionally alleged enhancing element of willfulness, deliberation, and premeditation in any section 656 analysis furthers the state's "substantial interest in enforcing its laws differentiating between noncapital murders and murders . . . an interest the prior federal prosecution could not and did not serve." (*Homick, supra,* 55 Cal.4th at p. 846.) In sum, like with the previously discussed elements of "one direct but ineffective step" and "intent to kill," the required element of "willfulness, deliberation, and premeditation" is different from and not necessary to prove DePape's federal assault; thus, section 656 does not

---

Bill No. 1432 (2003–2004 Reg. Sess.) as amended June 29, 2004, p. 4.) But in 2004, the Legislature amended section 656 to specifically preclude the attachment of jeopardy for crimes prosecuted in foreign countries because, "a problem has arisen due to a decision by the Supreme Court of Mexico to deny extradition in any case which is punishable by life imprisonment or by the death penalty. Since all murder is punishable by at least a life term in California, we can no longer extradite accused murderers who flee to Mexico. . . . Under California's statutory jeopardy law, these individuals [who "have received as little as eight years in prison for first degree murder"] cannot be retried when they return to California." (Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill No. 1432, *supra,* as amended June 29, 2004, pp. 4–5.) As attempted murder is similarly punishable by life imprisonment in California, it is inconsistent with the legislative history of section 656 to now prohibit consideration of the enhancing mental state necessary to be proven to trigger that enhanced punishment.

preclude the state prosecution of attempted premeditated murder in the first degree.

### *Elder Abuse – Elements*

Last, I consider whether prosecution for elder abuse in California requires proof of additional conduct not necessary to prove the federal assault for which DePape was convicted. Again, focusing on the elements of the charge rather than the conduct upon which the conviction was based or the evidence introduced at trial, elder abuse requires proof that: (1) the defendant willfully inflicted unjustifiable physical pain or mental suffering on Pelosi; (2) the defendant inflicted suffering on Pelosi under circumstances or conditions likely to produce great bodily harm or death; (3) Pelosi is an elder; and (4) when the defendant acted he knew or reasonably should have known that Pelosi was an elder. (CALCRIM No. 830; § 368, subd. (b)(1); see also *People v. Caparrotta* (2024) 103 Cal.App.5th 874, 904 [rejecting challenge to CALCRIM No. 830 as "without merit"].) An elder is someone who is at least 65 years old and "does not need to actually suffer great bodily harm." (§ 368, subd. (g); CALCRIM No. 830.) But if an elder does suffer great bodily harm, a fact finder may consider that fact, along with all the other evidence, in deciding whether the defendant committed the offense. (CALCRIM No. 830; *Caparrotta*, at p. 899 [identifying a nonexclusive list of considerations].) In addition, the specific elder abuse charge alleged in the California action included an enhancing allegation that, "in the commission of the offense the victim, [Pelosi] (AGE 82), suffered great bodily injury, within the meaning of Penal Code Section 368(b)(2)." Section 368, subdivision (b)(2)(B) provides in relevant part, "if the victim suffers great bodily injury, as defined in Section 12022.7, the defendant shall receive an additional term in the state prison as follows: [¶] . . . [¶] (B) Five years if the victim is 70 years of age or older."

23

Because an elements-based analysis shows there is no overlap between the elements of the enhanced elder abuse charged here and those necessary to prove DePape's federal assault, jeopardy does not attach.

Again, starting with the language of the federal indictment, which requires more than statutory federal assault, it was proven that DePape "willfully and unlawfully assaulted Paul Pelosi, the spouse and member of the immediate family of Nancy Pelosi, a United States official . . . by means of hitting a hammer on Mr. Pelosi's head."  According to the jury instructions, "there is a forcible assault when one person intentionally strikes another." Analogizing to their attempted murder discussion, the majority again focuses on the conduct upon which DePape's conviction was based, rather than the different elements required to have been proved, to decide, "this additional requirement for proof of the *offense* [of elder abuse] does not alter the *physical act* for which DePape was being prosecuted—the act of striking Pelosi's head with a hammer." (Maj. opn., *ante*, at p. 40.)  The majority therefore concludes "that the federal assault conviction was founded upon DePape's act of striking Pelosi's head with the hammer and that physical acts used as evidence establishing an element of an offense are not necessarily themselves the acts 'in respect to which [the defendant] is on trial,' " thus, section 656 precludes state court prosecution for elder abuse.  (Maj. opn., *ante*, at pp. 39–40.)  I disagree.

First, the "willful inflict[ion of] unjustifiable physical pain or mental suffering" necessary for elder abuse requires more than the federal assault's "intentionally striking another" because striking does not necessarily result in unjustifiable pain or suffering.  (Maj. opn., *ante*, at p. 41; see also *People v. Curtiss* (1931) 116 Cal.App.Supp. 771, 779–780 [unjustifiable means "the infliction of physical pain or mental suffering . . . , which *could not* be

24

defended, or vindicated, or which was not exculpable, excusable, or authorizable, under the circumstances"]; *People v. Heitzman* (1994) 9 Cal.4th 189, 198 [§ 368 applies "to a wide range of abusive situations, including . . . passive forms of abuse, such as extreme neglect"].)  This proof of unjustifiable pain or suffering refers to the effect on the victim, not the conduct of the defendant proven in the federal action.  (See *People v. Rae* (2002) 102 Cal.App.4th 116, 123; see also § 368, subd. (b)(1) [the prohibited conduct exposes the elder to "conditions likely to produce great bodily harm or death"].)

As *Homick* instructs, "A prior prosecution is not 'founded' or 'based,' within the meaning of section 656, on every piece of conduct shown by the evidence at the earlier trial." (*Homick*, *supra*, 55 Cal.4th at p. 844.)  This holding is inconsistent with the majority's determination that section 656 precludes the elder abuse prosecution because the federal assault conviction "was founded upon DePape's act of striking Pelosi's head with the hammer" and that the "additional requirement for proof of the *offense* [of elder abuse] does not alter the *physical act* for which DePape was being prosecuted." (Maj. opn., *ante*, at p. 39.)  In so holding, the majority dismisses the People's argument "that DePape's acts of arming himself with zip ties, breaking into the Pelosi home in the early morning hours and cornering Pelosi while he was sleeping in his bedroom constitute 'additional evidence which would support the particular nuances of an elder abuse charge' but was not 'necessary physical act evidence' for the federal assault charge." (Maj. opn., *ante*, at pp. 39–40.)

But again, this conclusion is inconsistent with the case law that requires the consideration of the "separate and distinct" elements of the elder abuse and federal assault because "double jeopardy will not lie unless all of

the elements of the one crime are included in the other." (*Candelaria II*, *supra*, 153 Cal.App.2d at p. 884.) And in conducting this analysis, one cannot consider "every piece of conduct shown by the evidence at the earlier trial." (*Homick*, *supra*, 55 Cal.4th at p. 844.) Thus, because elder abuse requires proof of the "willful inflict[ion of] unjustifiable physical pain or mental suffering" not necessary to DePape's federal assault conviction for the "intentional striking of another," section 656 does not bar the elder abuse prosecution.

Moreover, elder abuse under section 368, subdivision (b)(1) requires proof of the additional elements that Pelosi be an elder and that DePape knew or reasonably should have known that he was 65 years or older at the time of the infliction of harm. (CALCRIM No. 830; § 368, subd. (b)(1).) The majority does not discuss these elements or the enhancement alleged pursuant to section 368, subdivision (b)(1), and presumably folds them into their concluding statement that "additional nonact elements of the state offenses did not render section 656 inapplicable," but they deserve independent consideration.

As discussed, *Belcher* did not consider the victim's status as a federal agent a separate element for section 656 analysis because "conviction of the federal offense required proof of no additional *act* on the part of defendant; it merely required proof of the status of the victim [as a federal agent] for jurisdictional purposes." (*Belcher*, *supra*, 11 Cal.3d at p. 100.) A victim's "status" as an elder is jurisdictionally necessary to file charges in California for elder abuse, just as Pelosi's "status" as "the spouse . . . of a United States Official" was required for the assault prosecution in federal court. Thus, in terms of the base offense of elder abuse (and setting aside our conclusion that the effect on the victim required to be proved for elder abuse differs from the

26

conduct required to be proved for federal assault), I agree with the majority's apparent conclusion that Pelosi's status as an elder alone is insufficient to preclude the attachment of jeopardy.

But I reach a contrary conclusion when considering the remaining elements of the elder abuse charges, as well as the section 368, subdivision (b)(2) enhancement. As alleged in the federal indictment, the assault of Pelosi required the added proof that the act was done, "with intent to impede, intimidate, interfere with and retaliate against Nancy Pelosi while she was . . . engaged in and on account of the performance of her official duties." By contrast, the California elder abuse charge requires a defendant to act when he "knew or reasonably should have known that the victim was an elder" over the age of 65. (CALCRIM No. 830; § 368, subd. (b)(1).) Assault with the intent to retaliate based on the performance of a United States official's duties requires very different proof from abuse intended to be committed on a person over the age of 65 and does not fall within the scope of the general criminal intent considered in *Comingore.* As such, these elemental differences should preclude the attachment of jeopardy. (Compare 18 U.S.C. § 1201(a)(5), (d) [federal kidnapping]; *id.*, § 115(c)(4) [assault on United States official's family member] with Pen. Code, § 368, subd. (b)(1) [California elder abuse].)

Turning to the section 368, subdivision (b)(2) enhancement, like a lying-in-wait special circumstance, proof of great bodily injury and that a victim is over age 70 are enhancing allegations that "can be conceptualized, for double jeopardy purposes, as a greater offense." (See *Homick, supra,* 55 Cal.4th at p. 845.) Indeed, in California, elder abuse is punishable by "imprisonment in a county jail not exceeding one year . . . or by imprisonment in the state prison for two, three, or four years." (§ 368, subd. (b)(1).) But if

27

the victim suffers great bodily injury and is 70 years or older, "the defendant shall receive an additional term in the state prison" of five years. (§ 368, subd. (b)(2)(B).) Because "where two different sovereign governments are involved, the interest of each in punishing criminal conduct as it finds fitting also comes into play" (*Homick*, at p. 846) and suggests the proof required to find true a section 368, subdivision (b)(1) enhancement means that when comparing a federal assault conviction to an enhanced state court elder abuse prosecution within the scope of section 656, jeopardy does not attach.

For these reasons, I respectfully dissent and would reverse the judgment of the trial court dismissing count 1, attempted murder, and count 3, elder abuse, and their associated enhancements and would remand for further consideration. I concur with the majority's affirmance of the dismissal of count 4, assault with a deadly weapon.

DESAUTELS, J.

Trial Court:  San Francisco County Superior Court

Trial Judge:        Hon. Harry M. Dorfman

Counsel:

Brooke Jenkins, District Attorney, Natalie Fuchs, Nicholas J. Hunt, Assistant District Attorneys for Plaintiff and Appellant.

David A. Kaiser, under appointment by the Court of Appeal, for Defendant and Respondent.